2019 IL App (1st) 181024

Opinion filed: May 31, 2019

FIRST DISTRICT
Fifth Division

No. 1-18-1024

| | | |
|---|---|---|
| *In re* CA. B. and CH. B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos.   10 JA 950 and |
| | ) | 10 JA 951 |
| v. | ) | |
| | ) | Honorable |
| R.S., | ) | Peter J. Vilkelis, |
| | ) | Judge Presiding. |
| Respondent-Appellant | ) | |
| | ) | |
| (Ca. B. and Ch. B., | ) | |
| | ) | |
| Appellees)). | ) | |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Justices Hall and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent-appellant, R.S., appeals from an order terminating her parental rights with respect to minors-appellees, Ca. B. and Ch. B. For the following reasons, we affirm.[1]

¶ 2                            I. BACKGROUND

¶ 3    Ch. B. was born in 2006, and Ca. B. was born in 2010. Each minor is the biological daughter of R.S. and C.B.[2]

¶ 4    The State filed petitions for adjudication of wardship and motions for temporary custody with respect to both minors on October 22, 2010. Therein, the State alleged that both minors lived in an environment injurious to their welfare and were abused because their parents created

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

[2]The parental rights of C.B. were also terminated below, but that decision is not at issue in this appeal.

a substantial risk of physical injury. The factual allegations supporting these allegations were as follows:

> "Mother has one prior indicated report for neglect by substance misuse. Mother has had four other minors who were in DCFS care and custody with findings of abuse and neglect having been entered. Putative father has had two other minors who were in DCFS care and custody with findings of abuse and neglect having been entered. At the time of [Ca. B.'s] birth, both [Ca. B.] and mother tested positive for illegal substances. Mother admits to using illegal substances while pregnant with this minor. Mother has borne one other minor exposed to illegal substances. Putative father states that he has a history of using illegal substances. Paternity has not been established."

Based upon the allegations in these petitions, the trial court placed the minors under the temporary custody of the Department of Children and Family Services (DCFS) on the same day. Thereafter, following DNA testing, the trial court entered an order finding C.B. to be the biological father of the minors.

¶ 5    On April 12, 2011, the trial court adjudicated the minors neglected due to an injurious environment and abused due to a substantial risk of physical injury, with Ca. B. also found to be neglected due to being born drug-exposed. The basis for these findings was that Ca. B. tested positive for cannabis at the time of her birth and that R.S. tested positive for cannabis and cocaine at the same time.

¶ 6    In orders entered on August 22, 2011, the trial court found that R.S. and C.B. were unable to care for, protect, or discipline the minors. The trial court therefore ordered the minors to be wards of the court and appointed the DCFS guardianship administrator as the minors' guardian.

At the time, the trial court also entered a permanency goal of returning the minors home within 12 months.

¶ 7     From that time until October, 2015, R.S. was engaged in substance abuse services, and the trial court held regular permanency planning hearings to determine R.S.'s progress toward the goal of returning the minors home. In all but one instance, the trial court noted that R.S. had failed to make substantial progress toward that goal. On May 24, 2016, the trial court changed the permanency goal to substitute care pending court determination on termination of parental rights. With respect to this change, the trial court noted that R.S. was not making progress in her substance abuse services.

¶ 8     On November 2, 2016, the State filed termination of parental rights petitions with respect to the minors. The petitions alleged that R.S. was unfit for failing to (1) maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, (2) make reasonable efforts to correct the conditions which were the basis for the minors' removal, and/or (3) make reasonable progress toward the minors' return within nine months after adjudication of neglect or abuse, and/or within any nine-month period after adjudication. The State also contended that it was in the best interests of the minors that a guardian be appointed with the right to consent to their adoption, based upon the facts that (1) the minors had resided in foster care since December 3, 2010, (2) the minors' current foster parents desired to adopt the minors, and (3) adoption by the minors' foster parents was in the best interests of the minors.

¶ 9     At the fitness hearing, the trial court was presented with a host of documentary evidence and testimony. This included evidence that Ch. B. had been exposed to barbiturates and methadone *in utero* and continued to experience speech and motor development delays, severe inattention, hyperactivity, anger, and rage. She required specialized services for these issues.

Ca. B. tested positive for methadone and cannabis at the time of her birth and was treated for symptoms of withdrawal after being born.

¶ 10    Evaluations of R.S. indicated she had complex mental health issues, including diagnoses of depression, anxiety, and bipolar disorders, and had a history of both sexual abuse and domestic violence. To address these issues, as well as R.S.'s significant substance-abuse problems, DFCS concluded that R.S. was in need of the following services to address the conditions that caused the minors to come into DCFS custody: (1) substance-abuse treatment, (2) random drug screens, (3) psychiatric treatment, (4) medication monitoring, and (5) individual therapy.

¶ 11    However, the evidence presented at the fitness hearing established that R.S. had continually failed to fully comply with the requirements of these services. She did not reliably and adequately comply with her substance-abuse treatment, provide required documentation, submit to random drug screens, engage in mental health treatment, maintain contact with her caseworkers, or attend scheduled supervised visits with the minors. As a result, R.S. was denied her repeated requests for unsupervised visitation. As of January 2016, R.S. had not completed her substance-abuse program, was still using methadone, and continued to need treatment for her mental health issues.

¶ 12    At the conclusion of the fitness hearing, the trial court found R.S. unfit. The cause then proceeded to a best-interests hearing.

¶ 13    At that hearing, the trial court first took judicial notice of the evidence introduced at the fitness hearing, before being presented with additional documentary evidence and testimony. This included evidence that the minors had been placed in a number of foster homes—sometimes together, sometimes apart—over the years, in part due to the specialized issues and needs of

Ch. B. These included diagnoses of ADHD, intermittent explosive disorder, and mild mental retardation, which had at times required treatment with psychotropic medication. Ch. B. also exhibited anger management issues, poor impulse control, inappropriate sexualized behavior, and delayed speech.

¶ 14 The minors' current foster parent, Ms. H., has been Ca. B.'s foster parent since Ca. B. was a month old, with the exception of a one-year period when the minors were both placed in the care of another foster parent in an effort to have the sisters live together. Nevertheless, Ms. H. continued to visit Ca. B. and Ch. B. during that one-year period. When that foster parent no longer wished to care for the minors, Ms. H. volunteered to foster both minors. Both minors have lived with Ms. H. since February 2014.

¶ 15 In the time that the minors have been in Ms. H.'s care, Ch. B. has been attending a specialized school and is making "substantial progress," while Ca. B. was attending a regular school, "developing smoothly," and exhibiting no behavioral problems. Ms. H. testified that the minors love her adult son, who lives in the home. The minors are also bonded to Ms. H.'s sister, who cares for the minors after school until Ms. H. returns from work. The minors also have close relationships with Ms. H.'s adult daughter, children at school and in the neighborhood, as well as with Ms. H.'s extended family. While Ms. H. divorced her husband in December 2017, her ex-husband—with whom the minors have a very close, loving relationship—still talks to the minors daily and takes them on outings every Sunday. Ms. H., who had received continuous, specialized foster parent training to address Ch. B.'s needs, wanted to adopt the minors.

¶ 16 If she did adopt them, Ms. H. would encourage the minors to maintain existing relationships with the minors' older biological siblings and Ms. H.'s ex-husband. However, in light of significant tensions between her and R.S. and a litany of minor and/or unfounded

allegations against Ms. H. made by R.S. over the years, Ms. H. would be unwilling to facilitate contact between the minors and their mother.

¶ 17    The minors' current caseworker, Ms. W., testified that the minors were secure and attached to Ms. H. and were "thriving" under her care. The minors indicated to Ms. W. that they want to stay with Ms. H. Ms. H. provided a stable and safe environment for the minors, and Ms. W. had no concerns about Ms. H.'s ability to care for the minors.

¶ 18    This is despite the fact that R.S. and her attorney had made numerous, continuous complaints regarding Ms. H.'s care of the minors since at least November 2016. These ranged from relatively minor complaints about hairstyles and clothing to accusations of corporal punishment. As Ms. W. testified, she followed up on each of these claims and found them to be unfounded, with the single exception of an instance where Ms. H. allowed the minors to have an unsupervised visit with a prior foster parent, contrary to DCFS's prior instruction, brought out by R.S.'s counsel on cross-examination. The constant flow of accusations by R.S. had become very demoralizing to Ms. H.

¶ 19    In the end, Ms. W. testified that her agency had reviewed the matter and was recommending that it was in the minors' best interests that R.S.'s parental rights be terminated. Ms. W. became emotional on the witness stand as she acknowledged that she felt sympathy for R.S., and recognized that the minors did have a real, loving relationship with R.S. and would be hurt by having that relationship severed. Nevertheless, she also recognized that guardianship was not "realistic," as that would require Ms. H. to continue to support a relationship between R.S. and the minors.

¶ 20    Finally, the State introduced a clinical evaluation, prepared by a psychiatrist for the court. The report indicated that R.S. had a loving bond with the minors and that termination of R.S.'s

parental rights would be hurtful to the minors. However, the report also indicated that R.S. continued to minimize how her substance abuse affected her children and did not have a full appreciation of Ch. B.'s special needs. It opined that R.S. was unlikely to make meaningful, sustained long-term progress in her services and therefore was unlikely to be able to parent the children in the future. In light of the needs of the minors for permanency and a loving, committed, competent, and permanent caregiver, termination of R.S.'s parental rights was the result most likely to meet those needs.

¶ 21    After the introduction of this evidence by the State, counsel for R.S. indicated that R.S. would like to testify over the objection of counsel. R.S. thereafter presented testimony that was primarily presented in a narrative fashion. While the State objected a number of times to the narrative form of the testimony, its objections were never specifically ruled upon by the trial court. In her testimony, R.S. complained that Ms. H. had "turn[ed] her nose up" at R.S. from the beginning of the minors' case. She also accused Ms. H. of lying to the court and inflicting corporal punishment on the minors.

¶ 22    At the conclusion of the hearing, the trial court found it to be in the minors' best interests to terminate R.S.'s parental rights. R.S. timely appealed.

¶ 23                                    II. ANALYSIS

¶ 24    R.S. raises a number of issues on appeal, and we begin by considering her assertion that the trial court's decision to terminate her parental rights was incorrect.

¶ 25    The proceedings below were conducted according to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2016)), which directs the court to go through a two-step process when presented with a petition to terminate parental rights (705 ILCS 405/2-29(2) (West 2016); *In re C.W.*, 199 Ill. 2d 198, 210 (2002)). First, there must be a showing, based on clear

and convincing evidence, that the parent is "unfit" as that term is defined in the Adoption Act. *Id.* (citing 750 ILCS 50/1(D) (West 1998)). If the court makes a finding of unfitness, then the court moves on to determine whether it is in the best interests of the child that parental rights be terminated. *In re Adoption of Syck*, 138 Ill. 2d 255, 276 (1990). Here, R.S. does not contest the trial court's finding of unfitness; rather, as noted above, R.S. challenges the trial court's finding that it was in Ca. B.'s and Ch. B.'s best interests that her parental rights be terminated.

¶ 26    At the second stage of the proceedings, the issue is "no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). "Although the parent still possesses an interest in maintaining the parent-child relationship, the force of that interest is lessened by the court's finding that the parent is unfit to raise his or her child." *Id.* "Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* A decision to terminate parental rights in the best interests of the child must be supported by the preponderance of the evidence. *Id.* at 366.

¶ 27    " '[O]nce a court has found by clear and convincing evidence that a parent is unfit, the state's interest in protecting the child is sufficiently compelling to allow the termination of parental rights.' " *Id.* (quoting *In re R.C.*, 195 Ill. 2d 291, 308 (2001)). However, the trial court cannot rely solely on fitness findings to terminate parental rights. *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). Instead, pursuant to section 1-3(4.5) of the Act, "[t]he court is required to consider factually based statutory factors, separate from those considered during parental fitness hearings, which focus upon 'the child's age and developmental needs.' " *Id.* (quoting 705 ILCS 405/1-3(4.05) (West 2000)).

¶ 28    Those statutory factors include the physical safety and welfare of the child, including food, shelter, health, and clothing; the development of the child's identity; the child's background and ties, including the familial, cultural, and religious ties; the child's sense of attachments (which includes where the child actually feels love, attachment, and a sense of being valued; the child's sense of security; the child's sense of familiarity; the continuity of affection for the child; and the least disruptive placement alternative for the child); the child's wishes and long-term goals; the child's community ties, including church, school, and friends; the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; the uniqueness of every family and child; the risks attendant to entering and being in substitute care; and the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016).

¶ 29    The court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78.

¶ 30    While all these factors must be considered, no single factor is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. In addition, the trial court's best-interests determination need not contain an explicit reference to each of these factors, and we need not rely on any basis relied upon by the trial court in affirming its decision. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. We will not reverse the trial court's judgment as to termination unless it is against the manifest weight of the evidence. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. The trial court's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 20.

¶ 31   On appeal, R.S. faults the trial court for focusing too heavily on the evidence presented at the unfitness hearing and for purportedly giving "only cursory consideration to the factors as set forth in the statute." As evidence of the trial court's preoccupation with the evidence presented at the unfitness hearing, R.S. points to the trial court's observation that—as opposed to the minors' biological parents—there was no evidence of any substance-abuse or domestic violence in the minors' foster home. However, it is evident from the record that the trial court considered this evidence and made this comparison in addressing the physical safety and welfare of the minors. This is one of the very statutory best-interests factors to which R.S. contends the trial court gave only cursory consideration. 705 ILCS 405/1-3(4.05) (West 2016). To the extent that this analysis relied upon evidence introduced at the unfitness hearing, of which the trial court "took judicial notice," the court, at the best-interests hearing, must consider the "full range of the parent's conduct," including the grounds for finding the parent unfit. *In re C.W.*, 199 Ill. 2d at 217.

¶ 32   Moreover, we reiterate that the trial court's best-interests determination need not contain an explicit reference to each statutory factor (*In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19). The record clearly reveals that the trial court explicitly referenced and addressed the following additional statutory best-interests factors: (1) the development of the minors' identity; (2) the minors' background and ties, including familial, cultural, and religious ties; (3) the minors' sense of attachments; (4) the minors' need for permanence; (5) the least disruptive placement alternative; and (6) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016). R.S.'s contention that the trial court gave "only cursory consideration to the factors as set forth in the statute" is simply not supported by the record.

¶ 33   R.S. also faults the trial court for not asking the minors directly about their preference as to whom they would live with, essentially contending that the trial court ignored the statutory

requirement to consider "the child's wishes and long-term goals." *Id.* § 1-3(4.05)(e). However, what the trial court actually said regarding its consideration of the minors' preference was that (1) the guardian *ad litem* representing the minors did not request that the minors meet with the trial court, a request the trial court would have honored had it been made, (2) in the court's experience, "children get tired of being asked where do you want to live," and (3) in light of all the evidence presented, the trial court had "heard enough." The evidence presented included direct testimony from the minors' caseworker and case aide that the minors had expressed their desire to continue to live with Ms. H. Even if we did find some fault with the trial court's decision not to more directly ascertain the minors' preferences, we reiterate that no single best-interests factor is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48.

¶ 34    R.S. also relies upon *In re M.F.*, 326 Ill. App. 3d 1110 (2002), to support her assertion that the trial court's decision to terminate her parental rights was against the manifest weight of the evidence. However, in that case, the appellate court reversed the termination of the parental rights of a mother (a diagnosed schizophrenic) as to one of her two children only after concluding that

> "no benefits were shown to be gained by termination, the only result was to deprive [the minor] of an already established relationship with her mother. Visitation *** benefitted [the minor] in preserving a relationship with her mother, a noncustodial parent who loved her child and was *only* prevented from a more hands-on relationship by her mental disability." (Emphasis added.) *Id.* at 1118.

While the minors here also had a strong bond with R.S., the matter at hand is significantly different where R.S.'s parental rights were clearly not terminated *solely* on the basis of a mental disability.

¶ 35    We also reject R.S.'s contention that the trial court's decision to terminate her parental rights was improper because it would interfere with the strong bond the minors have with their older biological siblings. Ms. H. specifically testified that, even if she adopted the minors, she would continue to foster and support the minors' relationship with their biological siblings.

¶ 36    In sum, the trial court was presented with evidence that R.S. had long-term substance-abuse and mental health issues that had not been fully addressed, in part due to her persistent failure to fully comply with recommended services. All of her visits with the minors have been supervised for the same reasons. According to the clinical evaluation prepared for the trial court, it was unlikely that R.S. would make progress in the long term to be able to parent, and termination of parental rights was recommended by R.S.'s service provider.

¶ 37    In contrast, the trial court also heard evidence that Ms. H. provided a stable home environment in which the minors were thriving. Ms. H. was a consistent caregiver, and she had obtained specialized training to address Ch. B.'s special needs. Ms. H. wanted to adopt the minors, and the minors would continue to be embraced by the immediate and extended family of Ms. H., with whom the minors already had a strong relationship. While Ms. H. was now divorced from her husband, her former husband continued to play a significant role in the minors' lives. The minors reportedly loved Ms. H., and wanted to remain with her. There was also evidence that removing the minors from Ms. H. would be harmful.

¶ 38    While it is true that the minors did have a significant relationship with their mother, in light of all of the other evidence, we do not find that the trial court's decision to terminate R.S.'s parental rights was against the manifest weight of the evidence. See *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶¶ 28-35 (coming to same conclusion under similar circumstances); *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶¶ 100-01 (same).

¶ 39     In reaching this conclusion, we also reject two additional arguments R.S. advances on appeal. First, we disagree with R.S.'s contention that she was provided ineffective assistance of counsel when her trial counsel incorrectly assumed that she had a right to testify at the termination hearing against the advice of counsel, did not seek to withdraw in light of disagreement over R.S.'s decision to testify, and then permitted R.S. to testify in a narrative form.

¶ 40     In a termination of parental rights proceeding, parents have a statutory right to counsel. 705 ILCS 405/1-5(1) (West 2016). Recognizing a parent's right to counsel would be an empty gesture without a corresponding expectation that counsel render effective assistance. *In re R.G.*, 165 Ill. App. 3d 112, 127 (1988). Therefore, parents in a termination of parental rights proceeding have the statutory right to effective assistance by counsel. *In re C.C.*, 368 Ill. App. 3d 744, 748 (2006).

¶ 41     To adjudicate a parent's claim that he or she received ineffective assistance in a proceeding to terminate his or her parental rights, we apply the criteria found in *Strickland v. Washington*, 466 U.S. 668 (1984). *In re R.G.*, 165 Ill. App. 3d at 127. In order to obtain relief under *Strickland*, a parent must prove that (1) the performance of counsel in a termination proceeding fell below an objective standard of reasonableness (*Strickland*, 466 U.S. at 687-88), and (2) this substandard performance caused defendant prejudice by creating a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different (*id.* at 694). Our supreme court has held that "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008). Furthermore, both prongs of the *Strickland* test must be satisfied, and a failure to satisfy either one of the prongs precludes a finding of ineffectiveness. *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 42    R.S.'s initial premise, that her trial counsel incorrectly assumed that she had a right to testify at the termination hearing, is unfounded.

¶ 43    The Act itself provides parents in termination proceedings "the right to be present, *to be heard*, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel." (Emphasis added.) 705 ILCS 405/1-5(1) (West 2016). While R.S. contends this provision establishes at most "a right to be heard through counsel and does not give a parent the personal right to testify," we disagree. This section clearly provides a parent a personal right to be heard and, separately, the right to be represented by counsel. "[W]hen the language of the statute is clear, it must be applied as written without resort to aids or tools of interpretation." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). Moreover, to read the provision as R.S. asks us to would improperly violate the precept that appellate courts are not permitted to interpret statutory language in a manner that renders any part of the statute "redundant" or "superfluous." *Citizens Opposing Pollution v. ExxonMobil Coal U.S.A.*, 2012 IL 111286, ¶ 29.

¶ 44    Additionally, as this court has previously recognized, "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *In re Vanessa C.*, 316 Ill. App. 3d 475, 482 (2000). Thus, a "natural parent must be afforded the opportunity to participate in the [termination] proceeding in a meaningful manner in order to comport with due process requirements." *Id*. at 482-83 (2000) (citing *In re C.J.*, 272 Ill. App. 3d 461 (1995), and *In re D.R.*, 307 Ill. App. 3d 478 (1999)). As such, we have specifically ruled that barring a parent from presenting a defense or *testifying* in a termination proceeding does not comport with due process. *Id.* at 484.

¶ 45    Therefore, whether pursuant to the Act or the fundamental requirement of due process, R.S. had a personal right to testify at the termination hearing. Her trial counsel's recognition of this right clearly did not fall below an objective standard of reasonableness.

¶ 46    We also reject R.S.'s contention that her trial counsel's performance fell below an objective standard of reasonableness because counsel did not seek to withdraw in light of her disagreement with R.S.'s decision to testify. In support of this argument, R.S. cites the Illinois Rules of Professional Conduct of 2010, specifically Rule 1.2(a), which in relevant part provides: "In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify." Ill. R. Prof'l Conduct (2010) R. 1.2(a) (eff. Jan. 1, 2016). R.S. reads this provision to indicate that her trial counsel was not required to abide by her decision to testify at the noncriminal termination hearing. Furthermore, R.S. contends that, in light of the disagreement between her and her trial counsel on this issue, R.S.'s trial counsel should have sought to withdraw pursuant to the committee comments to Rule 1.2, which provide that if a "lawyer has a fundamental disagreement with the client, the lawyer may withdraw from the representation." *Id.* cmt. 2. We disagree.

¶ 47    First, Rule 1.2(a) is completely silent as to an attorney's responsibility with respect to a client's choice to testify at a termination proceeding. However, and as we have already noted, R.S. had a constitutional due process right to testify at the termination hearing, a proceeding that we have also recognized bears "indicia of a criminal proceeding." *In re Vanessa C.*, 316 Ill. App. 3d at 482-83 (citing *Santosky v. Kramer*, 455 U.S. 745, 762 (1982)). It is at least arguable that R.S.'s counsel had no choice but to abide by R.S.'s decision to testify in this matter, just as in a criminal matter.

¶ 48    Second, the comments to Rule 1.2(a) merely provide that if a "lawyer has a fundamental disagreement with the client, the lawyer *may* withdraw from the representation." (Emphasis added.) Ill. R. Prof'l Conduct (2010) R. 1.2 cmt. 2. (eff. Jan. 1, 2016). As the preamble to the Rules of Professional Conduct of 2010 specifically provides:

> "The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself. Some of the Rules are imperatives, cast in the terms 'shall' or 'shall not.' These define proper conduct for purposes of professional discipline. Others, generally cast in the term 'may,' are permissive and define areas under the Rules in which the lawyer has discretion to exercise professional judgment." Ill. R. Prof'l Conduct (2010), Preamble (eff. Jan. 1, 2010).

We find nothing to indicate that R.S.'s trial counsel violated Rule 1.2 by not seeking to withdraw, particularly at such a late stage in the termination proceedings. Rather, the record reveals that trial counsel properly made use of her discretion to exercise professional judgment with respect to the matter.

¶ 49    We also reject R.S.'s contention that she was provided ineffective assistance of counsel because her trial counsel "did not guide R.S. through her testimony" but rather "washed her hands of the matter by largely abandoning [R.S.] to an unhinged narrative."

¶ 50    As an initial matter, the record reflects that trial counsel specifically asked R.S. if she understood that the trial court would have to make a decision at the termination hearing by considering various statutory best-interests factors. After obtaining an affirmative response, trial counsel specifically asked R.S. what she would like to say with respect to those factors. Trial counsel also specifically asked R.S.—based upon her testimony—if she thought some of the

other witnesses had been dishonest in their testimony and interrupted R.S. at one point in an attempt to return R.S. to testimony relevant to the best-interests factors. Thus, it is not the case that R.S.'s trial counsel completely failed to guide her through her testimony.

¶ 51 It is nevertheless true that R.S. did largely testify in a narrative form, over multiple objections by the State that were not specifically ruled upon by the trial court. However, counsel is permitted to present the testimony of a witness in a narrative form in certain circumstances, such as when counsel anticipates the witness will commit perjury. *People v. Calhoun*, 351 Ill. App. 3d 1072, 1080 (2004). In addition, the trial court has discretion to allow witnesses to testify in a narrative form, and it is recognized that the danger of doing so is eliciting irrelevant and inadmissible evidence before an objection can be made by an *opposing party*. *People v. Dickman*, 117 Ill. App. 2d 436, 439 (1969).

¶ 52 Here, there was no specific indication that R.S.'s trial counsel suspected perjury. However, we again note (1) the discretion granted to trial counsel in the manner in which to present evidence and the trial court's discretion to accept evidence in a narrative form, (2) the potential for prejudice resulting from such a form of testimony is generally understood to fall on an opposing party, and (3) R.S.'s burden to prove that her trial counsel's actions were not reasonable (*People v. Govea*, 299 Ill. App. 3d 76, 89 (1998)). In light of these considerations, we conclude that R.S. has failed to show that presenting her testimony in a primarily narrative form fell below an objective standard of reasonableness.

¶ 53 Because R.S. has failed to establish the first *Strickland* prong with respect to any of the issues discussed above, her claim that she was provided ineffective assistance with respect thereto necessarily fails. *Simpson*, 2015 IL 116512, ¶ 35.

¶ 54    We next consider R.S.'s contention that she was prejudiced by the admission of other crimes/prior bad acts evidence at the best interests hearing, in the form of evidence regarding alleged false reports that R.S. had made concerning Ms. H. Acknowledging that this issue was not properly preserved for appellate review, R.S. ask us to consider this issue under the plain error doctrine. See *In re L.B.*, 2015 IL App (3d) 150023, ¶ 11 (because the termination of parental rights affects a fundamental liberty interest, plain error review is available on appeal from such proceedings). Alternatively, R.S. seeks review of this issue by contending that her trial counsel provided ineffective assistance by failing to object to the introduction of this evidence and by eliciting additional other crimes/prior bad acts evidence during cross-examination. We reject all of these arguments.

¶ 55    As R.S. herself acknowledges on appeal, the rules of evidence are substantially relaxed at a best-interests hearing, be it an initial dispositional hearing or at a best-interests hearing to determine a petition to terminate parental rights. See *In re Jay H.*, 395 Ill. App. 3d 1063, 1070 (2009) (recognizing that both a dispositional hearing and a best-interests hearing are functional equivalents, and as such both types of hearings "are subject to the same relaxed standard regarding the admission of evidence—that is, the formal rules of evidence do not apply"). We therefore apply the statutory evidentiary provisions applicable to a dispositional hearing to our consideration of the admission of evidence at the best-interests hearing below.

¶ 56    Section 2-22(1) of the Act specifically provides:

"At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public. *** *All evidence* helpful in determining

these questions, including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." (Emphasis added.) 705 ILCS 405/2-22(1) (West 2016).

As this court has recognized, "[i]t was the legislature's intent, through the above section, to give the trial court *wide latitude* in considering evidence that is relevant and helpful to the court's determination of a proper disposition." (Emphasis added.) *In re April C.*, 326 Ill. App. 3d 245, 261 (2001); see also *In re D.L.*, 226 Ill. App. 3d 177, 187 (1992) ("Although hearsay and other types of incompetent evidence may not be admissible at the adjudicatory hearing, they are admissible at the dispositional hearing.").

¶ 57    Moreover, even if the formal evidentiary rules applied in this instance, Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides that while "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," it also specifically provides that "[s]uch evidence may also be admissible for other purposes." "Other-crimes evidence is relevant when it 'has any tendency to make the existence of any fact that is of consequence to the determination of [the] action more or less probable than it would be without the evidence.' [Citation.]" *People v. Lewis*, 2015 IL App (1st) 130171, ¶ 46. "In deciding whether to allow other-crimes evidence, the trial court must also weigh the probative value of the evidence sought to be introduced against its prejudicial effect. [Citation.] If the prejudicial nature of the evidence outweighs its probative effect, the evidence should be excluded." *Id.* ¶ 47.

    " 'The admissibility of other-crimes evidence is committed to the sound discretion of the
    trial court, and its decision will not be disturbed absent a clear abuse of discretion.'
    [Citation.] 'An abuse of discretion occurs when the trial court's ruling is arbitrary,

fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court.' [Citation.]" *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 24.

¶ 58    On appeal, R.S. complains that the trial *court improperly* received evidence at the best-interests hearing "that R.S. had raised her concerns about the foster mother, that DCFS and the caseworker had investigated but rejected those concerns, [and] that the foster mother had taken umbrage over R.S.'s concerns," as this evidence "had no probative value towards determining the best interests of the children." Rather, this evidence was purportedly "improperly admitted for the sole purpose of sowing dislike [toward R.S.] in the factfinder." We disagree.

¶ 59    Under the Act, at the best-interests hearing the trial court was required to consider, among other factors, the physical safety and welfare of the children, including shelter and clothing; the children's family ties; the uniqueness of every family and child; and the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016). In addition, the trial court was permitted to consider the nature of the children's relationship with Ms. H., their present caretaker. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78. Assuming this evidence could actually be fairly categorized as other crimes and/or bad acts evidence, we fail to see how the resolution of several of R.S.'s claims and concerns are not relevant to those factors. These claims and concerns included (1) R.S.'s allegations of corporal punishment against Ms. H., (2) R.S.'s objections to the children's clothing, and (3) charges that Ms. H. allowed the children to be supervised by a former foster parent, contrary to prior instruction. Most of these allegations were investigated and held to be unfounded. The fact that Ms. H. was so upset by R.S.'s repeated, false allegations and insignificant complaints that she would be unwilling to allow R.S. to visit the children if she were to adopt them, is also relevant to those factors. Again, other crimes and/or prior bad acts evidence is relevant when it " 'has any tendency to make the

existence of any fact that is of consequence to the determination of [the] action more or less probable than it would be without the evidence.' [Citation.]" *Lewis*, 2015 IL App (1st) 130171, ¶ 46.

¶ 60    Moreover, we reject any contention that the prejudicial nature of this evidence outweighed its probative effect. It is generally understood that the potential for prejudice in admitting other crimes/prior bad acts evidence is that it will improperly be used to "prove the character of a person in order to show action in conformity therewith." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). But this was not a criminal trial seeking to prove R.S.'s guilt as to a specific crime; it was a best-interests hearing focused on the needs of the children. The traditional potential for prejudice inherent in such evidence simply was not a factor in the matter.

¶ 61    In sum, considering the relaxed evidentiary standard applicable at the best-interests hearing, the fact that the trial court had wide latitude to consider all helpful evidence, the evidence presented was probative as to the specific factors relevant to the best-interests hearing, and the potential for prejudice was minimal, we find that the trial court did not abuse its discretion in admitting the challenged evidence. As such, we reject R.S.'s claim of plain error. *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 64 ("If there was no error in the first instance, there can be no plain error."). For similar reasons, we reject R.S.'s contention that her trial counsel was ineffective for failing to object to such evidence. *People v. Jackson*, 357 Ill. App. 3d 313, 323 (2005) (where evidence is admissible, defense counsel is not required to perform the useless act of objecting, and thus cannot be faulted for such a failure to do so).

¶ 62    Finally, we reject R.S.'s contention that her counsel was ineffective for eliciting evidence of R.S.'s complaints regarding Ms. H. during her cross-examination of the caseworker.

¶ 63     The record is quite clear that evidence had already been admitted of repeated, minute or false accusations or criticisms of Ms. H. by R.S. The evidence elicited by R.S.'s trial counsel during cross-examination showed that, at least in one instance, R.S.'s concerns were well-founded. This evidence then provided support to the closing argument of R.S.'s trial counsel, in which she specifically argued that R.S.'s "concerns in part were substantiated."

¶ 64     Generally, "the manner and extent of cross-examination are matters of trial strategy that will not ordinarily support an ineffective-assistance-of-counsel claim." *People v. Watson*, 2012 IL App (2d) 091328, ¶ 32. In light of this record, we find no basis to fault R.S.'s trial counsel to elicit testimony that was—if anything—helpful to R.S.

¶ 65                                    III. CONCLUSION

¶ 66     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 67     Affirmed.