NOTICE

Decision filed 08/03/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230029-U

NOS. 5-23-0029, 5-23-0030, 5-23-0031,

5-23-0032 cons.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* C.J., N.B., N.B., and J.S., Minors | ) ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) ) | Jackson County. |
| Petitioner-Appellee, | ) ) | Nos. 20-JA-26, 20-JA-27, 20-JA-28, 20-JA-29 |
| v. | ) ) | |
| Sade J., | ) ) | Honorable Ella L. Travelstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Boie and Justice Welch concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's finding that it was in the best interest of the children to terminate respondent's parental rights is reversed where the court failed to address the statutory factors and its sole finding in the written order was unsupported by the evidence presented at the hearing.

¶ 2    Respondent, Sade J., appeals the trial court's finding that it was in the best interest of the children to terminate her parental rights. In the alternative, Sade argues that her trial counsel was ineffective. For the following reasons, we reverse.

1

¶ 3                              BACKGROUND

¶ 4     On July 29, 2020, the State filed four petitions for adjudication of wardship alleging that Sade's children, N.B. (born October 6, 2017), N.B. (born August 1, 2016), J.S. (born January 14, 2015), and C.J. (born February 14, 2009), were neglected. The petitions alleged Sade exhibited "untreated mental illness symptoms" that prevented her from effectively caring for the children.

¶ 5     A shelter-care hearing was held on July 30, 2020. Rebecca Mills, an Illinois Department of Children and Family Services (DCFS) investigator, testified that on July 28, 2020, she responded to a report claiming Sade's mental health was declining. The informant stated Sade knocked holes in the dwelling's walls with a hammer, burned a mattress on her front lawn, and broke the dwelling's windows.

¶ 6     When Ms. Mills arrived at the house, she intended to implement a safety plan, rather than take the children into protective custody. However, Sade was "erratic, screaming, yelling, stating that there were people trying to kill her, people had been breaking into the house, she couldn't sleep, [and] she had to protect her children because she'd seen people trying to stab her in the back." The investigator stated, "it was nonstop the entire time I was there."

¶ 7     Ms. Mills contacted her supervisor to call the police, and another caseworker arrived to assist in taking the children into protective custody. Ms. Mills did not think Sade could adequately supervise her children due to her mental health issues. She testified to a previous investigation in which "the children were outside in the vehicle playing [and] set the car on fire." Ms. Mills stated that DCFS wanted the children to remain in protective custody until Sade could address her mental health issues. She opined this could be a long-term issue given Sade's denials of mental health issues. On cross-examination, Ms. Mills explained that the children were taken into custody because Sade would not calm down. She stated Sade became more erratic, as "the hallucinations,

2

the paranoia [was] more apparent the longer I was there." The circuit court found an immediate and urgent necessity to remove the children from Sade's care and placed the children into DCFS's care and custody.

¶ 8 An adjudicatory hearing was held on September 9, 2020. At that time, Sade stipulated that investigator Mills's testimony would be similar to that provided during the shelter-care hearing. The court found the children neglected and continued DCFS's custody of the children.

¶ 9 Sade's service plan was filed on October 1, 2020. The plan called for Sade to cooperate with Lutheran Social Services of Illinois (LSSI)[1] and inform the agency of any changes in her address, phone number, household composition, or employment. The plan also required Sade to complete parenting classes, obtain suitable housing, obtain a mental health assessment, and comply with all recommendations stemming from the mental health assessment.

¶ 10 On October 5, 2020, LSSI filed its dispositional report for the period from July 2020 to October 5, 2020. The report revealed that upon inspection of Sade's home, there were no appliances. There was an air mattress in Sade's room and a lawn chair in the living room. The report stated that Sade advised the caseworker that she would refuse to take mental health medication even if recommended for her services. Visitation was scheduled for one hour once a week. Sade attended the first three visits but missed the next three because she was out of town. The report noted Sade had no working telephone that would allow for supervised telephone visits with the children. When Sade attended the in-person visitations, she was attentive, active, and revealed a bond with her children. She also understood her children's needs by providing asthma medication for one of the children, along with food and clothing.

[1]LSSI was a subcontractor of DCFS in this matter.

¶ 11    The dispositional hearing was held on October 7, 2020. Due to difficulties in filing the dispositional report, the supervisor, Mallory Bollinger, testified as to the contents of the report. The main issue continued to be Sade's mental health. Ms. Bollinger testified that Sade had not visited the children in about four weeks and only had sporadic contact with her caseworker. Sade had a counselor at Centerstone, and they were doing telehealth. The children were doing well in foster care and Sade was working on obtaining housing. Following Ms. Bollinger's testimony, the court found the children neglected, the service plan was appropriate, and it was in the best interest of the minors to remain outside the home. Custody of the minor children remained with DCFS.

¶ 12    Following the court's ruling, Sade's counsel asked the court if a psychological evaluation was needed. The court deferred to Ms. Bollinger who stated she believed respondent's diagnoses were schizophrenia and bipolar and the "main thing would be for her to participate in mental health treatment, to be seen by a counselor." Ms. Bollinger also stated:

> "At this point, I mean, I'm not sure that maybe counseling is enough. I think there's probably some more intensive treatment that needs to happen, which [Sade] isn't very open to right now so that's definitely something to explore. *** It's been reported that she's been out of town for a week. So[,] we haven't had much chance to have contact with her."

¶ 13    Sade advised the court that she had "been going through Cornerstone." She also indicated that she has been taking all of her steps without any help or assistance from family or the caseworkers. She disagreed with the court's finding that her children should have been removed because when she was contacting the agency for assistance, no one would help her. She did not feel "that was okay." She further disagreed with the counselor's opinion that she "needed something further than Centerstone." The court admonished Sade that she needed to cooperate

4

with LSSI and participate in those mental health services. Thereafter, Sade requested, no less than eight times, that LSSI be removed from the case because they would not help her, and she believed the agency was failing her. She further indicated that the prior caseworker "did not just leave Lutheran Social Services," insinuating that the caseworker was fired. The court admonished Sade to cooperate with LSSI or she risked losing her children. Sade stated, "You all already did that anyway. You've already even took my kids from me." The court explained that the children could be returned if she corrected the conditions. Thereafter, Sade advised the court that her children were not getting daycare and did not have winter coats. The court expressed its understanding and set the case for a permanency hearing on February 3, 2021.

¶ 14    On January 25, 2021, the DCFS permanency hearing report was filed. The report indicated Sade had not participated in a parenting program and there were "large portions of this reporting period when LSSI did not have a current address or phone number" for her. The report indicated Sade became "agitated" when mental health was addressed, and Sade continued to state she did not need mental health treatment. The report stated Sade had not participated in services to correct the conditions that brought her children into care and was not consistent in attending visitation.

¶ 15    At the permanency hearing, the court asked the caseworker for a brief overview. With regard to Sade, the caseworker advised the court that Sade "has not complied with services and has not participated in any of them." Sade disagreed stating, "I have been compliant with my service plan" and had done everything except the parenting class. She stated that she had reached out to Centerstone and her counselors, but a lot of the workers no longer worked in those positions. She also reached out to the supervisor to determine how she was not complying with the service plan. The court advised Sade to contact her attorney and the caseworker. Sade's attorney advised the court that Sade had taken steps to begin the parenting program and stated there was confusion,

5

but it was clarified. Counsel further indicated Sade was still in counseling and was willing to continue counseling, however, one of the counselors moved or relocated which delayed things. Sade did understand and was willing to undergo those services. The court admonished Sade to continue to participate in her services.

¶ 16    Permanency reports were filed on March 24, 2021, and September 13, 2021. Both reports stated Sade was noncompliant with the mental health services. The March report also stated Sade missed the majority of her visits with the children. The September report indicated that Sade was being evicted and jeopardizing the children's current placement with public accusations of abuse against the foster parents. The September report recommended the case proceed to legal screening. Following a status hearing on November 16, 2021, the court docket entry stated, "Mom not fully cooperating—needs new releases to determine whether she is completing mental health counseling & parenting classes." The entry further ordered a "psych eval" for Sade.

¶ 17    On November 12, 2021, LSSI submitted its status report to the court. The report indicated that since the September hearing, Sade stopped doing in-person visits with her children and was using Zoom. During those visits, Sade hinted that she was in Minnesota and would not provide the agency with her location. The report stated Sade was online shopping during visitation and the children did not appear attentive. The report further stated that Sade talked negatively about people, towns, and the agency during the November 3, 2021, visitation. When Sade did not stop, the agency warned her that the visit would end if she could not be "positive." Sade responded with an insulting response and the agency immediately terminated the visit. When Sade failed to confirm the next week's visit, she was denied visitation. The report stated Sade indicated she would not comply with services and would refuse her psychological assessment once it was scheduled. On

6

September 28, 2021, Centerstone issued a report indicating Sade was not consistently attending counseling and was not making progress when she did attend.

¶ 18    At the November 16, 2021, hearing, Sade refused to provide her location to the court. The caseworker confirmed that the case was proceeding to legal screening. The court admonished Sade to comply with the service plan or risk termination of her parental rights. The case was set for hearing on March 22, 2022.

¶ 19    The agency permanency report was filed on March 9, 2022. The report indicated Sade completed parenting courses at Centerstone but was noncompliant with counseling. Sade was referred for a psychological assessment, but it was denied by the DCFS clinician who reviewed the request due to Sade's lack of involvement in services. Sade continued to maintain that she did not need help for mental health or have mental health issues. After being advised that the agency would be reporting her as not having made satisfactory progress, Sade sent the agency a profane email. Sade continued to refuse to disclose her current location although some of her family members thought she was living in a shelter in Carbondale.

¶ 20    At the March 22, 2022, hearing, Ms. Bollinger advised the court that Sade often missed visitation. Sade was living at the "Warming Center" in Carbondale. Ms. Bollinger acknowledged that Sade completed a mental health assessment, and was recommended for individual counseling, "but then they dropped the counseling portion for nonattendance. She'll have to get going again." The court admonished Sade of the need to complete mental health services, to which she responded, "I never needed mental health from the beginning."

¶ 21    The June 15, 2022, report described Sade as noncompliant with treatment and mentally unstable, continuing to refuse services, and sending threatening or degrading emails to the agency. Visitations continued to take place via Zoom, and there were several instances where Sade did not

join in the call and would then email the caseworker cussing at her, calling her names, threatening her, and stating she was not provided the correct link to join. Sade requested in-person visits, but they were denied by the agency because they did not believe it would be in the children's best interests. The report stated that Sade obtained housing but had not completed her services. She had contacted Centerstone and was put on a waiting list.

¶ 22 At the June 28, 2022, hearing, Sade stated that she had not received a copy of the permanency report and, upon request from the court, provided the court with her current address. The court then provided Sade with information in the report. The court asked the caseworker if there were any updates from the report. The caseworker advised that Sade had not completed any of her services, her emails to the agency were "belligerent, filled with profanity, [and] threatening in nature," and Sade failed to participate in visitation. Sade disputed the caseworker's statements. The caseworker's supervisor advised the court that the case would proceed to legal screening the following day and they would recommend a goal change thereafter. The guardian *ad litem* (GAL) agreed with the goal change. The GAL also stated that the oldest child no longer wanted to visit with Sade and was indicating that he wanted and needed permanency. Sade's counsel disagreed with a goal change prior to legal screening. The trial court found no reasonable effort by Sade and admonished her to cooperate with and complete the service plan or she risked termination of her parental rights. Thereafter, Sade requested a different judge, preferably a black judge. She also requested a black attorney and, again, for LSSI to be removed from the case. Sade's requests were denied. Sade was advised that her attorney could file any motions regarding the judge's removal.

¶ 23 On July 12, 2022, LSSI filed a status report indicating that Sade continued to send inappropriate emails and acted inappropriately with the children's caregivers. She had housing but was noncompliant with other service goals. The case passed legal screening, a goal change to

"substitute care pending termination" was requested, and the children were doing well. Following a permanency hearing on July 26, 2022, the trial court issued a docket entry noting Sade's attempt to reengage with counseling but further noted Sade "refused to re-enroll with psych and take recommended mental health medication, critical decision made to discontinue visitations last week because of harassment and threatening nature of emails." The court found no reasonable effort by Sade. On July 28, 2022, Sade filed a *pro se* motion requesting a substitution of judge. The trial court denied the motion on August 9, 2022, because the motion was not filed by Sade's counsel.

¶ 24    On October 27, 2022, the State filed a petition for termination of parental rights for each child. The petitions alleged that Sade failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor children pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)) and failed to make reasonable progress toward the return of the minor children for the nine-month period from January 1, 2022, to September 30, 2022, pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)).

¶ 25    The petitions proceeded to hearing on January 10, 2023. The State called Ms. Bollinger who testified that she evaluated the service plan four or five times since July 31, 2020. Each time, Sade was rated unsatisfactory. Ms. Bollinger opined that Sade frequently lived out of state and the agency had no way to contact her. When the agency did have contact with her, "it was just a barrage of emails with obscenities and phone calls and voicemails and 'Give me my kids back.' " The video visits were "not very successful" because Sade "was usually agitated." Although visits were offered weekly, Sade participated in less than five between November 2021 and July 2022 when LSSI suspended the visits. Ms. Bollinger confirmed that Sade's mental health was the agency's chief concern. She was not participating in the recommended psychiatric services. From January 2022 through the end of September 2022, she did not participate in any mental health

9

services. During that time, Sade continued to demonstrate the same mental issues as before. On cross-examination, Ms. Bollinger testified that Sade was discharged for unsuccessfully completing mental health services at Centerstone. She reengaged in March 2021, attended one session, and then dropped out. Ms. Bollinger conceded that she had not recently contacted Centerstone to determine Sade's status at the facility and was unsure when they last checked with the facility.

¶ 26    Sade testified that she had been going to counseling "back and forth." She stated she performed a psychological evaluation, had it updated, told her caseworker several times that she was enrolled in services and provided the requisite consent forms that would allow the agency to receive that information. She disagreed that reunification was ever a true goal, stating that beginning at the first meeting the agency was asking her to sign her rights over. She testified that when she was sent back for another psychological evaluation the facility told her that she had already done one and she should not have to do another. She testified that she gave this information to LSSI several times. She eventually redid the psychological evaluation in May, gave the agency her address, and asked if LSSI would come do a home safety check.

¶ 27    Sade testified that the place she obtained to live was large enough to hold her and the four children, but the agency refused to do a safety check. They told her that her children were well taken care of, and she was not going to get her children back. Thereafter, she let the place go. With regard to visitation, Sade testified about her inability to log in and stated that when she was able to log on, not all of the children were there. She stated she had no problems getting to or attending in-person visitation. Sade further testified that she left the state to obtain medical treatment and when she returned the agency would not assist her in finding housing.

¶ 28    After all the parties declined the opportunity to provide closing argument, the court found Sade was an unfit parent, having failed to make reasonable progress towards the return of the

children for any nine-month period following the adjudication of neglect. The court also found Sade failed to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare.

¶ 29    Thereafter, the case proceeded immediately to a best interest hearing. The State declined the opportunity to present any witnesses or evidence. The GAL called Ms. Bollinger who initially testified regarding the children's fathers never visiting the children or expressing any interest in the children. As to Sade, Ms. Bollinger testified that C.J. indicated a few times that he did not want to attend visits with his mother. She stated this was due to the children waiting for Sade to appear during the Zoom visitations. She stated the children resided in stable, loving homes throughout the case. Sade interjected stating, "No. Them ain't loving homes. They are hurtful homes." The court admonished Sade about interrupting. Sade again stated, "Them ain't loving homes. They are hurtful homes." Ms. Bollinger stated the children were currently placed in appropriate, loving, and stable homes. She stated the children were not in the same home but had contact with each other at least four hours a month. Sade interrupted stating, "No, they do not." Ms. Bollinger stated one of the foster mothers had the brothers for a sleep over so occasionally the children would see each other more than four hours a month.

¶ 30    Ms. Bollinger testified that she did not personally go to the foster homes monthly, but a staff member did. She believed the children were all well cared for, happy, and loved. Sade interrupted again stating, "They done trash my kids. They've got my kids in rags, looking like bums." Ms. Bollinger testified that it was her professional opinion, based on her knowledge of the record and contacts with the parties involved, that all parental rights should be terminated. Sade stated, "Fuck on here. She don't even have a right over nobody kids trashy ass." The court directed Sade to refrain from using profane language in court. Sade replied, "You about to sit up there and

11

take my rights and—" The court admonished Sade to stop. After the court determined that no other witnesses were being called, the court asked the parties if anyone wished to provide argument. All of the parties declined.

¶ 31    Thereafter, the court stated, "Based upon the testimony of the Court, the Court finds by the preponderance of the evidence it is in the best interests of the minor that all parental rights and residual parental rights flowing to and through *** Sade ***, with respect to the minor children *** be hereinafter terminated." Sade repeatedly asked what she was supposed to do without her kids. The court stated, "I need to tell you—" but Sade interrupted saying, "No. Don't say shit to me. What am I supposed to do without my kids? That's all I ever had was my kids." The court advised Sade that she had the right to appeal. Sade interrupted saying, "I am. I hate you all. I hate white people." The court stated, "That's all you need to say, that you know you have the rights to appeal." Sade replied, "Rights? Bitch, you took my rights from my kids." Sade left the courtroom, and the court stated the minors would be placed in the care of DCFS and changed the goal to adoption. Written orders for each child were filed on January 18, 2023, finding that Sade "had not had the best interest of the minor, *** in mind for several years" and terminated Sade's parental rights. Sade timely appealed and this court consolidated the appeals.

¶ 32                                          ANALYSIS

¶ 33    Prior to discussing the merits of this case, we address the timeliness of our decision. This case was designated as "accelerated" pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018) due to it involving a matter affecting the best interest of a child. Rule 311(a)(5) requires this court to issue "its decision within 150 days after filing the notice of appeal" unless good cause is shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, our disposition was due on June 20, 2023. Sade's appellate counsel initially filed an *Anders* motion (see *Anders v. California*, 386 U.S.

738 (1967)) and supporting brief requesting withdrawal as appointed counsel finding no meritorious issue for review. Upon review of respondent's pleadings, as well as the record, this court determined that Sade's counsel failed to address an issue and provided counsel with the opportunity to either supplement the *Anders* supporting brief or brief the issue as one of merit. Counsel chose the latter and we extended the original briefing deadline to allow the State to file a responsive brief, which it did. "We cannot properly review a case and render our decision until we are fully briefed on the issues and the arguments of the parties." *In re Chance H*., 2019 IL App (1st) 180053, ¶ 35. This case was not ready for disposition until after the 150 days expired. Accordingly, we find good cause for issuing our decision after the 150-day time limit.

¶ 34 Turning to the merits, Sade raises two issues. She contends the trial court's finding that it was in the best interest of the children to terminate her parental rights was against the manifest weight of the evidence. In the alternative, she contends her trial counsel was ineffective.

¶ 35 To terminate a party's parental rights, a circuit court must make two separate and distinct findings: that the State has proven (1) that the parents are "unfit persons" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) and (2) that it is in the children's best interests to terminate that party's parental rights. *In re M.H.*, 2015 IL App (4th) 150397, ¶ 20 (citing 705 ILCS 405/2-29(2) (West 2014)). Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re C.P.*, 191 Ill. App. 3d 237, 244 (1989). As such, the State must first establish, by clear and convincing evidence, that a parent is unfit under one of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Tiffany M*., 353 Ill. App. 3d 883, 889 (2004). "If the court makes a finding of unfitness, the court then considers whether it is in the best interests of the child that

parental rights be terminated." *In re C.W.*, 199 Ill. 2d 198, 210 (2002). In this case, no argument regarding Sade's fitness was raised, and therefore, we move to the second stage.

¶ 36    At the best interests hearing "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). To make the best interest determination, the trial court must consider 10 statutory factors. 705 ILCS 405/1-3(4.05) (West 2020). These factors include (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the people available to care for the child. *Id.* "The court may also consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his or her emotional and psychological well-being." *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 30.

¶ 37    The court's best interest determination is not required to "contain an explicit reference to each of these factors." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. We will only overturn a court's best interest determination if it is against the manifest weight of the evidence. *In re Tiffany M.*, 353 Ill. App. 3d at 892. "A decision will be found to be against the manifest weight of the evidence in cases 'where the opposite conclusion is clearly evident or where the findings are unreasonable, arbitrary, and not based upon any of the evidence.' " *In re Shru. R.*, 2014 IL App (4th) 140275, ¶ 24 (quoting *In re Tasha L.-I.*, 383 Ill. App. 3d 45, 52 (2008)).

¶ 38    On appeal, Sade argues that the State failed to meet its burden of proof because it presented no evidence at the best interest hearing. Sade further argues that there is no evidence the trial court considered the statutory factors in reaching the conclusion to terminate Sade's parental rights. In

response, the State contends that the GAL's procurement of testimony was sufficient to replace the State's failure to present any evidence itself, stating the issue of who presents the evidence was irrelevant. The State's response further contends it was unnecessary for the trial court to address any of the statutory factors when rendering its decision and argues that even if it was error for the trial court to fail to address the factors, this court is not bound by the trial court's findings and can affirm based on any evidence in in the record.

¶ 39    It is the State's burden to prove, by a preponderance of the evidence, that it is in a child's best interest to terminate parental rights. *In re D.T.*, 212 Ill. 2d at 366. While it matters not from whom the evidence is elicited, we find it incredulous that the State failed to produce any evidence or present any argument at the best interest hearing. Despite such failure, we note the GAL attempted to obtain evidence, via testimony from the caseworker, to serve as a basis for the court to determine whether termination of Sade's parental rights was in the best interest of the children. The testimony obtained, however, was paltry and generic at best.

¶ 40    Here, despite there being four children at issue, the testimony only addressed one child specifically, and that testimony merely revealed that C.J. did not want to participate in visitation with Sade due to difficulties stemming from the Zoom visitation. No testimony regarding the other three children's desire to spend time, even if only by Zoom, with Sade was presented. The children were 5, 6, 8, and 13 years old at the time of the hearing. Despite their ages, no testimony was provided, and no evidence was submitted, regarding the medical conditions, developmental concerns, schooling, adjustment to new communities, the children's attachments, wishes and long-term goals, or their adjustment to being in foster care.

¶ 41    Equally lacking was any evidence specifically addressing any of the foster homes. Contrary to the State's argument, there was no testimony revealing when each child was placed in the current

15

foster home. Further there was no evidence submitted addressing the stability of the foster parents, the number of other children in the foster homes, the relationships between the children and the parties residing in the foster homes, or even information regarding the willingness of any of the foster parents to continue in their current roles. While the caseworker answered affirmatively when asked whether the children were in stable, loving homes, no supportive details or information was elicited. Further, the evidence failed to show any benefit to the children by terminating Sade's parental rights. See *In re M.F.*, 326 Ill. App. 3d 1110, 1118 (2002) ("As no benefits were shown to be gained by the termination, the only result was to deprive T.R. of an already established relationship with her mother *** who loved her child and was only prevented from a more hands-on relationship by her mental disability."). Here, all four children were of sufficient age to develop a relationship with Sade, and no evidence regarding the status of the mother-child bond was presented.

¶ 42    The State, citing *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 31, and *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 78, argues that we need not rely on any basis cited by the trial court and invites us to affirm the decision on any basis in the record. We decline to accept the State's invitation. While we are well aware that this court is not required to rely on any basis provided by the trial court, we could not here even if we wanted because no basis was provided.

¶ 43    Despite the legislature providing 10 statutory factors for consideration by the trial court and case law providing additional factors, the trial court failed to address any factor or provide any basis for its finding that termination of Sade's parental rights was in the best interest of the children. In fact, the trial court did not even mention the statutory factors or state that it considered them when issuing its ruling.

¶ 44    The State also contends the GAL-acquired testimony is sufficient to address 3 of the 10 statutory factors. We disagree and find the record insufficient to make a determination on the issue. While no single factor is dispositive (*In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48), we find the testimony lacking as to every factor given the lack of specificity provided for any child or foster family.

¶ 45    The trial court ultimately decided that it was in the best interest of the children to terminate Sade's parental rights. The State claims "it would be folly to speculate that the trial court was somehow unaware of its obligation to consider the statutory requirements." We place little merit in the State's argument considering its own failure to provide evidence or argument at the hearing. The court cannot make findings involving the statutory factors without evidence. Here, while no findings were made in the court's oral proclamation, the court's only finding in the written order stated that Sade *** had not had the best interest of the minors *** in mind for several years." However, no testimony or evidence supporting that statement was provided at the best interest hearing. As the record provides no basis for us to determine the propriety of the trial court's ultimate decision, we cannot affirm the decision.

¶ 46    The State also argues that if this court were to find that the lack of factual findings inhibited our review, we should remand the case to the trial court to make those findings, instead of reversing the trial court's order. We again disagree. As noted throughout this decision, there is a complete lack of evidence on which the decision was issued. Accordingly, we reverse the trial court's order finding it was in the best interest of the children to terminate Sade's parental rights and remand the case to the trial court for new hearing on the children's best interests.[2]

---

[2]Although we note a similar lack of evidence submitted and argument presented by Sade's counsel at the best interest hearing, in light of our holding regarding the best interest factor, we find it unnecessary to address Sade's alternative argument.

¶ 47                          CONCLUSION

¶ 48    For the foregoing reasons, we reverse the trial court's order finding it was in the best

interest of the children to terminate Sade's parental rights.

¶ 49    Reversed and remanded.