2021 IL App (2d) 210094-U
No. 2-21-0094
Order filed June 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* L.W., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 17-JA-21 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis M. Martinez, |
| Appellee v. Adam W., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hudson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Appointed appellate counsel's motion to withdraw was granted where respondent's appeal from the termination of his parental rights with respect to his minor child presented no issues of arguable merit. Affirmed.

¶ 2    Respondent, Adam W., appeals from orders of the circuit court of Winnebago County finding that he was an unfit parent and that it was in the best interests of his minor child, L.W., that respondent's parental rights be terminated. Respondent's appointed appellate counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). For the reasons set forth below, we grant appellate counsel's motion and affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Respondent is the biological father of L.W., born December 26, 2015. L.W.'s biological mother, F.R., consented to the adoption of L.W. by the foster parents (F.R.'s aunt and uncle). F.R.'s parental rights are not at issue in this appeal.

¶ 5                              A. Initial Proceedings

¶ 6    This case was initiated following a September 19, 2016, incident in which F.R. left L.W. (almost nine months old at the time) in her car without supervision. On January 19, 2017, the State filed a petition for an adjudication of wardship with respect to L.W. The petition alleged that L.W. was a neglected minor on the basis that L.W.'s environment was injurious to his welfare in that F.R. had substance abuse and mental health issues that prevented her from properly parenting, thereby placing L.W. at risk of harm. See 705 ILCS 405/2-3(1)(b) (West 2016).

¶ 7    On February 1, 2017, the trial court held a shelter-care hearing at which respondents agreed to waive their right to a temporary custody order. Pursuant to the agreement, the trial court entered an order placing L.W. in the temporary guardianship and custody of the Department of Children and Family Services (DCFS), with discretion to place L.W. with respondent, with a responsible relative, or in foster care. However, on May 1, 2017, the trial court entered an order providing that DCFS did not have discretion to place L.W. with respondent, instead allowing respondent supervised visitation. L.W. initially was placed with his maternal grandmother but subsequently placed with his maternal great-aunt and great-uncle.

¶ 8    On June 28, 2017, the State filed a four-count amended petition for an adjudication of wardship. The petition alleged that L.W. was a neglected minor on the basis that L.W.'s environment was injurious to his welfare in that (1) F.R. had a substance abuse issue that prevented her from properly parenting, thereby placing L.W. at risk of harm (see 705 ILCS 405/2-3(1)(b) (West 2016)); (2) F.R. had a mental health issue that prevented her from properly parenting,

thereby placing L.W. at risk of harm (see 705 ILCS 405/2-3(1)(b) (West 2016)); and (3) F.R. left L.W. in a car without supervision on a warm day, thereby placing L.W. at risk of harm (see 705 ILCS 405/2-3(1)(b) (West 2016)). The petition also alleged that L.W. was an abused minor in that F.R. created a substantial risk of physical injury to L.W., other than by accidental means, which would likely cause disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function, in that F.R. left L.W. in a car without supervision on a warm day (see 705 ILCS 405/2-3(2)(ii) (West 2016)).

¶ 9                                    B. Adjudicatory Proceedings

¶ 10    The case was scheduled for an adjudicatory hearing on August 11, 2017. However, the parties reached an agreement pursuant to which F.R. stipulated to count I of the amended neglect petition, and respondent agreed not to object. The trial court entered an adjudicatory order on August 11, 2017, setting forth the stipulation and agreement, dismissing the remaining counts, and reflecting the parties' agreement to engage in recommended services.

¶ 11                                    C. Dispositional Proceedings

¶ 12    On January 18, 2018, the trial court held a dispositional hearing. Tina Studer, the assigned caseworker, testified that respondent was engaged in individual counseling, had just begun domestic violence classes, and was scheduled to begin parenting classes and parent coaching. She further testified that respondent's counselor had reported that counseling was going well and that there was no current concern regarding drug use. Studer testified that the recommendation for domestic violence counseling was based upon reported allegations from the mother of respondent's other son. Studer further testified that respondent was allowed supervised visitation with L.W. on Sundays for approximately four hours. Respondent's mother supervised the

visitation. Studer recommended that guardianship and custody of L.W. remain with DCFS because the parents were "still working on services."

¶ 13    Following Studer's testimony and the parties' conference with the trial court, the parties agreed to the entry of a finding that both parents were unfit or unable to care for L.W. Accordingly, the trial court entered a dispositional order on January 18, 2018, adjudicating L.W. neglected, making him a ward of the court, and placing continued guardianship and custody with DCFS.

¶ 14                    D. Permanency-Review Proceedings

¶ 15    The trial court held several permanency-review hearings over the next two and a half years. We discuss the ensuing proceedings as they pertain to respondent. At a June 26, 2018, permanency-review hearing, the State reported that respondent "completed a parenting class, is going to individual counseling and domestic violence services" and "also completed a psychological assessment." The trial court found that respondent had made reasonable efforts.

¶ 16    At a January 29, 2019, permanency-review hearing, the guardian *ad litem* reported that, although respondent was successfully discharged from parenting coaching, respondent "has not had any contact with [L.W.] since September and also disengaged in all services since September because of a warrant out for his arrest" involving domestic violence charges. Respondent's attorney responded that visitation had stopped because respondent had been in custody since October 19, 2018. The trial court found that respondent had made reasonable efforts but not reasonable progress.

¶ 17    The trial court held another permanency-review hearing on April 24, 2019. Nick Massetti, the assigned child welfare specialist, testified that respondent had been released from custody in February 2019. He further testified that respondent had recently completed a domestic violence

assessment, was in individual counseling, and had completed parenting classes. The trial court found that respondent had made reasonable efforts and progress.

¶ 18    However, at a permanency-review hearing on August 14, 2019, the State reported: "The only service that has been asked of [respondent] is the domestic violence program. He was unsuccessfully discharged from that and will need to be restarting but he has not done so." The trial court found that respondent had not made reasonable efforts or progress. The trial court found that respondent was "demonstrating a level of personal irresponsibility which makes it difficult to find him fit to care for any child." Likewise, following a November 20, 2019, permanency-review hearing, the trial court found that respondent had not made reasonable efforts or progress.

¶ 19    Following a permanency-review hearing on June 26, 2020, the trial court found that respondent had not made reasonable efforts or progress. The trial court further found that in was in L.W.'s best interests to change the permanency goal to substitute care pending termination of parental rights.

¶ 20                          E. Motion to Terminate Parental Rights

¶ 21    On August 3, 2020, the State filed a three-count motion to terminate respondent's parental rights with respect to L.W., alleging: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to L.W.'s welfare (750 ILCS 50/1(D)(b) (West 2016)); (2) failure to make reasonable efforts to correct the conditions that caused L.W.'s removal, during a nine-month time period following adjudication, from June 26, 2019, to March 26, 2020, and/or August 14, 2019, to June 26, 2020 (750 ILCS 50/1(D)(m)(i) (West 2016)); and (3) failure to make reasonable progress toward the return of L.W. to him during a nine-month time period following adjudication, from June 26, 2019, to March 26, 2020, and/or August 14, 2019, to June 26, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2016)).

¶ 22                                     F. Termination Proceedings

¶ 23                                          1. Unfitness

¶ 24    The unfitness phase of the termination-of-parental-rights hearing was conducted on December 3, 2020, and January 8, 2021. At the State's request, without objection, the DCFS integrated assessment for respondent, service plans, and two indicated packets regarding L.W. were admitted into evidence. Respondent stipulated to the foundation for admission of the service plans.

¶ 25    The State called as a witness Annette Givens, the assigned child welfare specialist. Givens testified that respondent had completed parenting classes and parenting coaching but had not completed the domestic violence services for which he had been referred. She testified that it was reported to her that respondent had been arrested for domestic violence and violation of an order of protection, resulting in a referral for domestic violence services.

¶ 26    Givens further testified that she "had a hard time finding [respondent] at times" and "having an updated phone number to make contact with him." She explained that respondent never reached a point of having unsupervised visitation with L.W. In response to questioning regarding concerns about respondent's ability to care for L.W., Givens testified that, "[a]t this time I would say, yes, [] due to the fact that he hasn't had any contact with L.W. and to the fact that he doesn't—he's not consistent with staying in contact with myself or with the current foster parents in regards to visitation."

¶ 27    According to the service plan, respondent's last visitation with L.W. was 10 months earlier—in February 2020. Givens acknowledged that the COVID-19 pandemic resulted in suspension of in-person visits for parents from March 2020 through June 2020 and that respondent had been incarcerated since July 2020. She also testified that she was aware that respondent had

pled guilty to methamphetamine possession earlier in 2020 and that he was arrested in August 2020 on new charges and currently incarcerated for burglary.

¶ 28    Respondent called Scott Tenney, a caseworker at Rosecrance and respondent's caseworker in the Therapeutic Intervention Program (TIP) with the Seventeenth Judicial Circuit Court. Tenney explained that the TIP program is "an adult probation program that also serves to be a dual diagnosis treatment program" and involves mental health and substance abuse treatment. Tenney testified that respondent was a new participant in the TIP program and that the standard duration of the program was 30 months. Respondent had been released from jail that morning. Tenney explained that the TIP program provided a furlough "to the extent that he participates in services with us and at his recovery housing." According to Tenney, "we are just getting [respondent] enrolled into services and into supportive recovery housing." Tenney explained that "we are establishing him with a weekly treatment schedule, we are putting him on our drug screening schedule, we're getting him set up with probation and we are doing community resource referrals as they become available to him."

¶ 29    Respondent testified on his own behalf. He had been in custody since July 10, 2020, and had been released that morning. Respondent testified that, before the inception of this case (from L.W.'s birth to nine-months-old), L.W. resided with him "for weeks at a time." During those times, respondent cared for L.W., worked two jobs, and paid for daycare. Respondent testified that, at the inception of this case, L.W. initially was placed with his maternal grandparents but was moved to his current foster care placement after respondent voiced concerns regarding the safety of the maternal grandparents' home.

¶ 30    Respondent further testified that he successfully completed parenting classes and parent coaching and consistently visited L.W. on Sundays from 2017 to February 2020. Respondent's

mother supervised the visits; a parent coach was present at several of the visits and raised no concerns about his parenting. Visitation ceased in February 2020 due to health concerns about the COVID-19 pandemic. Respondent testified that he did not have video visitation with L.W. because he was not apprised of the option until June 2020, and shortly thereafter, he was incarcerated. Respondent testified that he did not call or send letters to L.W. while incarcerated because he did not have contact information. Respondent's plan was to resume visitation with L.W.

¶ 31    Respondent acknowledged that a former girlfriend obtained a plenary order of protection against him. He testified that he had "suffered with addiction since [he] was fourteen or fifteen years old." He testified that he was "dropped for drugs and alcohol throughout the duration of this case," and "[o]ther than a positive for alcohol and a positive for T.H.C.," none of the drops were positive.

¶ 32    At the close of respondent's case, respondent's counsel requested that the trial court take judicial notice of the caseworker reports filed throughout the duration of the case, as well as the permanency-review orders, "including those that found father had made reasonable efforts and progress and/or reasonable efforts at different times." The trial court responded: "And I am allowed to do that. The reports have been filed and were the basis of the permanency review grades and are of sufficient reliability to take judicial notice of, as well as the orders of the Court, which we routinely take judicial notice of." The guardian *ad litem* requested clarification that the trial court's judicial notice of any reports would exclude any hearsay included in the reports. The trial court responded: "What I would take into consideration are what the reports said about services; what he did and did not do." Following closing arguments, the trial court took the matter under advisement.

¶ 33    The trial court issued its ruling on January 22, 2021, finding that the State met its burden of proving respondent unfit by clear and convincing evidence as to each count in the motion to terminate respondent's parental rights. The trial court noted that, as set forth in the July 31, 2019, service plan, respondent was "discharged from domestic violence counseling at that time and did not complete that service, at least at that time." Respondent "then absented himself and failed to communicate with the caseworker, the evidence seems to indicate, from May of 2019 until the plan, July 31, 2019." Thus, as of July 31, 2019, respondent "had not engaged in the services necessary to cure conditions." The trial court further noted that, as set forth in the February 24, 2020, service plan, respondent "still had not engaged in the necessary services—specifically, domestic violence services" at that time. The trial court noted that respondent "also isolated himself by not communicating with the caseworker" and that the caseworker "cites one contact during this six-month review period."

¶ 34    Turning to the July 31, 2020, service plan, the trial court stated, "[p]er the family service plan, there was still not completion of services and visitation began to deteriorate or actually deteriorated and was somewhat sporadic." The trial court noted that respondent's recent engagement with the TIP program "is certainly a positive move on his behalf, but it is not sufficient to overcome the history of this case of [respondent's] relationship to this case." In finding that the State met its burden, the trial court reiterated that "[t]his is not to deprecate his most recent effort." Rather, respondent's start in the TIP program was a "very good step" but "does not negate the evidence that was relevant to the specific counts in the petition."

¶ 35                                    2. Best Interests

¶ 36    Following the trial court's ruling with respect to respondent's unfitness, the case proceeded to a best-interests hearing that day. The State called caseworker Givens as a witness. She testified

that the foster parents had a "warm and welcoming" home with two adult children who lived with them. She explained that L.W. was "well adjusted to the home," referred to his foster parents as "mom and dad," and identified himself using the foster parents' last name. Givens testified that L.W. "never expressed anything negative about his living environment, and he seems well adjusted and loves being in the home." She concluded that L.W. is a "happy little boy" and "loved by everyone in the home." She testified that the foster parents were willing to take permanent custody of L.W. and that the agency's opinion was that it was in L.W.'s best interests to remain with the foster parents.

¶ 37    Respondent testified on his own behalf. He stated that he had been in the TIP program for approximately a month and was fully compliant with all requirements of the program, including "[t]hree-day-a-week classes, one-day-a-week probation meetings, one-day-a-week court, one-day-a-week therapy sessions." He testified that he was living in transitional housing at Jericho House and that he planned to move back to his former residence (which his grandmother owned), once he obtained a vehicle. Respondent stated that he was unemployed at the time. However, he had been a mechanic for 15 years and anticipated returning to school to pursue another career.

¶ 38    Respondent further testified that the last time he conversed with L.W. was before the COVID-19 pandemic. However, respondent testified, prior to the inception of this case, he "would take [L.W.] for two and three weeks at a time with minimal communication with the mother." From 2017 through 2019, he visited L.W. weekly and developed a strong bond with L.W. during the visits. Respondent described the bond as follows: "Pretty much anything I was doing he wanted to have a part in it." Respondent testified that L.W. referred to him as "[d]ad" during their visits. In response to questioning regarding the lack of video visits, respondent testified that he did not understand the reason he was uninformed of the option but also that it was his understanding that

the foster parents "weren't real tech savvy." Respondent testified that he desired resumed visitation with L.W. and, ultimately, L.W.'s return home to him. Respondent explained: "That was the goal of involving myself in services voluntarily prior to the acknowledgement even of this case. They didn't know that I was the father 'cause they had obtained the birth certificate late, after I was already involved in services."

¶ 39    Respondent also called his mother as a witness. She testified that she had supervised respondent's weekly visits with L.W. and described the bond between respondent and L.W. and L.W.'s relationship with the extended family.

¶ 40    The State requested that the trial court take judicial notice of respondent's convictions and the probable cause statements therein and listed several case numbers. Respondent's counsel objected to the extent "there were no convictions" and also "object[ed] to the probable cause statements themselves." The trial court responded: "I'll look to see if there's convictions. I would more than likely take those into consideration." Following closing arguments, the trial court took the case under advisement.

¶ 41    The trial court issued its ruling on January 28, 2021, finding that the State showed, by a preponderance of the evidence, that it was in L.W.'s best interests to terminate respondent's parental rights.

¶ 42    The trial court found:

> "In this case it is clear that [L.W.] is very integrated into his placement. It was brought up and it was testified to that he calls his foster parents Mom and Dad. And this tells the Court something. This tells the Court how this child views his foster parents.
>
> And the Court understands that they have been the primary caretaker of this child for an extended period of time. The child came into care at the age of thirteen months, and

since that time has been with them and they have provided for all his needs. They have awoken with him in the morning, they have put him to bed at night, they have comforted him when he's upset and they have shared their joy with him when he's been joyful.

His identity. His identity, which is one of the factors for best interest, he is a member of the [P.] family. That's what he identifies as. That's what the Court takes from all the information. And the Court agrees that separation from this family at this time would be traumatic for this child."

¶ 43   The trial court commended respondent for his efforts in the TIP program but noted that the duration of the program was 30 months and "that is simply too long of a time to keep a child in care without a guarantee." The trial court wished respondent success in the program but noted that "it's entirely possible [respondent] does not succeed and we're at square one at the end of thirty months." The trial court stated that "it would simply be contrary to the spirit and the words of the Juvenile Court Act to extend this case and extend this minor in care for thirty months on the hope that father can become fit at some point." Accordingly, the trial court entered an order, finding it was in L.W.'s best interests that respondent's parental rights be terminated with respect to L.W. and granting DCFS, as L.W.'s legal guardian, the power to consent to L.W.'s adoption.

¶ 44                                    G. *Anders* Motion

¶ 45   Respondent timely appealed. The trial court appointed counsel to represent respondent on appeal. Appellate counsel filed a motion to withdraw pursuant to *Anders*, 386 U.S. 738. Appellate counsel supported his motion with a memorandum of law providing a statement of facts, potential issues, and an argument as to why the potential issues lack arguable merit. Appellate counsel avers that he served respondent with a copy of the motion and memorandum. The clerk of this court also

issued an order, notifying respondent of the motion and allowing him 30 days to respond. The 30-day time period has passed, and respondent has not filed a response.[1]

¶ 46                                    II. ANALYSIS

¶ 47    Appellate counsel identifies three potential issues in his motion to withdraw—a challenge to the unfitness finding, a challenge to the best-interests finding, and an ineffective-assistance-of-trial-counsel claim. Initially, we review the procedure for moving to withdraw in termination-of-parental-rights cases.

¶ 48                              A. *Anders* Procedure

¶ 49    "As a threshold matter in a nonmeritorious termination-of-parental-rights appeal, counsel should state in the introduction to the argument portion of the *Anders* brief that he or she has reviewed both the finding of unfitness and the best interest determination." *In re Alexa J.*, 345 Ill. App. 3d 985, 989 (2003). The brief must refer to " 'anything in the record that might arguably support the appeal.' " *Id.* at 987 (quoting *Anders*, 386 U.S. at 744). Counsel is obliged to sketch the argument in support of the issues that could conceivably be raised on appeal and set forth the reasons why the arguments are frivolous. *In re J.P.* 2016 IL App (1st) 161518, ¶ 6. "Then, counsel must conclude that no viable grounds exist for the appeal." *Id.* Finally, counsel should include transcripts of the fitness and best-interests hearings. *Alexa J.*, 345 Ill. App. 3d at 988-89.

¶ 50    Here, while appellate counsel's motion to withdraw substantively complied with this procedure, we note that it reflects a procedural misunderstanding of the standard for submission of an *Anders* motion. Specifically, in his motion to withdraw, counsel asserts that he thoroughly

_____

[1] This was the second notice issued by the clerk of this court. The first notice to respondent was returned as undeliverable.

reviewed the record on appeal and that "[t]here might be a colorable argument on Counts 1, 2 and 3 due to lack of clear and convincing evidence that the domestic violence services (failure of which to complete was the stated grounds of the court's ruling on fitness) were necessary." Notwithstanding, appellate counsel asserts, he "found no legitimate basis for arguing that the state did not meet its burden on Count 1 as to failure to show reasonable responsibility, and a proper finding of unfitness on any one ground is sufficient to sustain the trial court's judgment."

¶ 51    Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)) indeed sets forth numerous grounds under which a parent may be deemed unfit, and appellate counsel is correct that any one ground, properly proven, is sufficient to enter a finding of unfitness. *In re C.W.*, 199 Ill. 2d 198, 210 (2002). For this reason, courts of review may affirm an unfitness finding on any ground. *In re Zy. D.*, 2021 IL App (2d) 200629, ¶ 7. Importantly, however, "[i]t is axiomatic that counsel, whether seeking to withdraw or otherwise, does not have the same authority or responsibility that this court has." *Id.* Rather, counsel's request to withdraw "must be accompanied by a brief referring to *anything* in the record that might arguably support the appeal." (Emphasis in original and internal quotation marks omitted.) *Id.*

¶ 52    Nonetheless, despite appellate counsel's suggestion that he would *not* sketch an argument regarding the lack of clear and convincing evidence of the need for domestic violence services, he actually proceeded to do so, as discussed below. Accordingly, though emphasizing the standard for submission of an *Anders* motion, we nevertheless turn to the issues identified in the motion.

¶ 53                                B. Potential Issues

¶ 54    As discussed, appellate counsel identifies three potential issues in his motion to withdraw—a challenge to the unfitness finding, a challenge to the best-interests finding, and an ineffective-assistance-of-trial-counsel claim. We address each issue in turn.

¶ 55    The Juvenile Court Act of 1987 (Act) sets forth a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/1-1 *et seq.* (West 2016). Initially, the State must establish, by clear and convincing evidence, that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2016)). See 705 ILCS 405/2-29(2), (4) (West 2016); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interests. See 705 ILCS 405/2-29(2) (West 2016); *In re D.T.*, 212 Ill. 2d 347, 367 (2004). We will not disturb a trial court's findings with respect to parental unfitness or the child's best interests unless the findings are against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶¶ 30, 43. A decision is against the manifest weight of the evidence " 'only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence.' " *Id.* ¶ 30 (quoting *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16).

¶ 56                                    1. Unfitness

¶ 57    The trial court found respondent unfit on all three grounds alleged: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to L.W.'s welfare (750 ILCS 50/1(D)(b) (West 2016)); (2) failure to make reasonable efforts to correct the conditions that caused L.W.'s removal, during a nine-month time period following adjudication, from June 26, 2019, to March 26, 2020, and/or August 14, 2019, to June 26, 2020 (750 ILCS 50/1(D)(m)(i) (West 2016)); and (3) failure to make reasonable progress toward the return of L.W. to him during a nine-month time period following adjudication, from June 26, 2019, to March 26, 2020, and/or August 14, 2019, to June 26, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2016)). The trial court cited the

deterioration of visitation with L.W. and respondent's failure to engage in domestic violence services.

¶ 58    We agree with appellate counsel that respondent would not be able to show that the trial court's finding that he was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to L.W.'s welfare (count I) was against the manifest weight of the evidence. A parent is not fit merely because the parent has shown some interest in or affection for a child. See *In re M.J.*, 314 Ill. App. 3d 649, 657 (2000). Rather, the interest, concern, and responsibility must be objectively reasonable. *Id.* Moreover, failure of a parent to comply with the directives of a service plan with the stated goal of return a child home "is tantamount to objectively unreasonable interest, concern, or responsibility as to the child's welfare." *Id.*

¶ 59    Here, the evidence established that respondent had weekly supervised visitation with L.W. from 2017 through 2019. However, at the time of his testimony on January 8, 2021, respondent had not had any visitation with L.W. for almost a year—since February 2020. Infrequent or irregular visitation with the child is sufficient to support a finding of unfitness under section 1(D)(b). *In re Shauntae P.,* 2012 IL App (1st) 112280, ¶ 90. Appellate counsel points out that visitation was impeded by the COVID-19 pandemic and respondent's incarceration. When physical contact and personal visits are impractical, letters or telephone calls may suffice to demonstrate a reasonable degree of interest, concern, or responsibility. See *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). However, respondent admitted no such contact with L.W.

¶ 60    Moreover, the record demonstrated that respondent failed to comply with the directive of his service plan to engage in domestic violence services. See *M.J.*, 314 Ill. App. 3d at 657 (even "consistent attendance at scheduled visitations alone does not demonstrate objectively reasonable interest, concern, or responsibility as to the children's welfare where a parent otherwise fails to

substantially comply with the other directives of the service plan in the face of knowing that substantial compliance is necessary in order to have children returned home"). Though respondent had just begun a 30-month dual treatment program for mental health and substance abuse issues, the trial court reasonably determined that this was not enough to negate respondent's earlier failings.

¶ 61    We also agree with appellate counsel that respondent would not be able to show that the trial court's finding that he was unfit for failure to make reasonable efforts or progress during the specified time periods (counts II and III) was against the manifest weight of the evidence. The evidence established that respondent had not completed the recommended domestic violence services. Appellate counsel contends that the State relied upon "multi-level hearsay" set forth in the service plans to prove that the domestic violence services were necessary. However, appellate counsel acknowledges that this court rejected the basis for this argument in *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 66. Accordingly, respondent would not be able to establish that the trial court's unfitness finding was against the manifest weight of the evidence.

¶ 62                                      2. Best Interests

¶ 63    The next potential issue appellate counsel raises is a challenge to the trial court's best-interests determination. The focus of the termination proceeding shifts to the child following a finding of unfitness. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 75. "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life. *Id.* Accordingly, at the best-interests stage, the following factors must be considered in the context of the child's age and developmental needs: (1) the

child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016).

¶ 64    Appellate counsel is correct that respondent would not be able to establish that the trial court's best-interests determination was against the manifest weight of the evidence. The State offered evidence regarding L.W.'s "warm and welcoming" foster home, L.W.'s attachment to his foster parents, and their willingness to adopt him. Though respondent and his mother testified regarding the bond between respondent and L.W., respondent had not been in contact with L.W. for almost a year at the time of the hearing. Respondent had been incarcerated until the morning of the hearing, was living in a residential transition facility, and was enrolled in a 30-month dual treatment program for mental health and substance abuse issues. As the trial court noted, respondent presented no evidence that he would be prepared to take custody of L.W. at any time in the foreseeable future. In sum, given the evidence set forth in the record, respondent would not be able to establish that the decision to terminate his parental rights was against the manifest weight of the evidence.

¶ 65                                3. Ineffective Assistance of Trial Counsel

¶ 66    The final potential issue appellate counsel identifies is an ineffective-assistance-of-counsel claim. Although there is no constitutional right to counsel in proceedings pursuant to the Act, a parent has a statutory right to counsel in a proceeding to terminate his or her parental rights. 705

ILCS 405/1-5(1) (West 2016); *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 41. To adjudicate a parent's claim of ineffective assistance of counsel in a proceeding to terminate parental rights, we apply the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Ca. B.*, 2019 IL App (1st) 181024, ¶ 42. Thus, to prevail on a claim of ineffective assistance of counsel, a parent must show that counsel's performance fell below an objective standard of reasonableness and that, but for the error, a reasonable probability exists that the result of the proceeding would have been different. *Id.* (citing *Strickland*, 466 U.S. at 687-88, 694). Both prongs of the *Strickland* test must be satisfied; thus, the failure to satisfy either one of the prongs precludes a finding of ineffective assistance of counsel. *Id.*

¶ 67    The asserted ineffectiveness is trial counsel's failure to object to the admission of "multi-level hearsay" to prove the necessity of domestic violence services. However, as discussed, we rejected the basis for this argument in *Z.J.*, 2020 IL App (2d) 190824, ¶ 66. In addition, appellate counsel states that he considered an argument that trial counsel was ineffective for eliciting testimony regarding respondent's participation in the TIP program. However, appellate counsel notes, trial counsel could have believed that, "as a tactical matter[], the testimony regarding [respondent's] participation in the TIP program was the only way that [respondent] could show he was currently engaged in efforts to complete the services, including the domestic violence services, that were the stated ground for the trial court's ruling." We agree that such a challenge would not be successful, as the record demonstrates no basis upon which to establish the requisite prejudice under *Strickland*. Indeed, the trial court commended respondent for his enrollment in the TIP program but determined that this "positive move" did not "negate the evidence that was relevant to the specific counts in the petition." Accordingly, we agree with appellate counsel that there is no arguable merit to the asserted ineffective-assistance-of-counsel claim.

¶ 68                                   III. CONCLUSION

¶ 69     After examining the record, the motion to withdraw, and the supporting memorandum of
law, we agree with appellate counsel that respondent's appeal presents no issue of arguable merit.
Thus, we grant the motion to withdraw and affirm the judgment of the circuit court of Winnebago
County.

¶ 70     Affirmed.