2024 IL App (2d) 240214-U
No. 2-24-0214
Order filed August 21, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* S.W., a Minor | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | No. 20-JA-121 |
| | ) | |
| (The People of the State of Illinois, Petitioner- | ) | Honorable |
| Appellee v. Margaret W., Respondent- | ) | Mary H. Nader, |
| Appellant). | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Kennedy concurred in the judgment and opinion.

**ORDER**

¶ 1    *Held*:  Neither the trial court's findings regarding the mother's unfitness nor the child's
best interests were against the manifest weight of the evidence.

¶ 2    Respondent, Margaret W., appeals the judgment of the circuit court of McHenry County

determining her to be unfit and terminating her parental rights to her minor child, S.W.  On appeal,

respondent challenges the trial court's decision to take judicial notice of the court file as

insufficiently clear to ensure it considered only admissible, non-hearsay, evidence and contends

the overall unfitness finding was against the manifest weight of the evidence.  Respondent also

argues that the court's best interest finding was against the manifest weight of the evidence because

it considered her fitness instead of the child's best interests and failed to account for the foster

family preferentially receiving training to care for the child while she was denied that training or

the strong mother-child bond between respondent and S.W.  We affirm.

¶ 3                                   I. BACKGROUND

¶ 4      In January 2014, respondent gave birth to S.W.  At that time, respondent and her husband, Sam W., had two other children.  The oldest child was significantly impaired in his mental functioning by autism and required constant care.  The middle child, C.W., was born in 2007 and was on the autism spectrum but attended school.[1]

¶ 5      On November 16, 2020, S.W. was seen and treated for severe malnourishment by Dr. Sandeep Narang, a doctor with Children's Hospital Wisconsin.  At the time of treatment, S.W. was six years of age and weighed only 32 pounds.  He had last been taken to see a doctor in 2018, and he was significantly malnourished with vitamin and protein deficiencies, osteopenia (weak bones), anemia, kwashiorkor, electrolyte imbalance, and concerns he could experience refeeding syndrome, and was provisionally diagnosed with a nonorganic failure to thrive.  S.W.'s health issues were not suddenly emergent; rather, they developed over months or years to reach the level of severity that S.W. presented.  Narang believed that S.W.'s case was one of the most serious he had ever treated.  Narang diagnosed S.W. with malnutrition, secondary to neglect.

¶ 6      The record shows that respondent and Sam W. were legitimately and reasonably concerned that S.W. was autistic given their experience with their oldest child, who was formally diagnosed with autism and required 24-hour care.  S.W. was difficult to feed, refusing to eat anything but cheese crackers and other crunchy foods. When S.W. did not get his way or had to leave the house, he typically threw a tantrum.  Thus, when he was finally taken for medical treatment, he was not potty trained, had not attended school (having been homeschooled), and spoke words and was terse in his verbal communications.  As S.W.'s treatment progressed, it was determined that he was not

_____

[1]While C.W. was initially involved in the proceedings below in circuit court case No. 20-JA-122, C.W. is not at issue in this appeal.  Likewise, Sam W. is not a party in this appeal.

autistic, was able to form bonds with people, had a good vocabulary, and was not selectively mute. The record further shows that respondent and Sam W. disagreed with the diagnosis that S.W. was not autistic, attributed S.W.'s malnutrition to gastrointestinal medical issues, disagreed with proposed therapies and treatments, and were unable to accept their roles in S.W.'s health and nutritional issues.

¶ 7    As a result of S.W.'s health issues, on November 23, 2020, the State filed an abuse and neglect petition alleging that S.W. was neglected and not receiving proper or necessary support, education, or medical care necessary for his well-being, was in an environment injurious to his welfare, and alleging that S.W. was abused because the parents inflicted physical injury and created the substantial risk of physical injury. The State amended the petition three times during its pendency. On July 15, 2021, the State filed its third amended petition for adjudication and expedited termination of parental rights.

¶ 8    The adjudication phase of this case took an inordinate amount of time, in part, due to treating the S.W.'s many medical issues. During the pendency, the parents participated in recommended services. On July 29, 2022, the trial court issued its written adjudication decision, finding that S.W. was abused and neglected. The court expressly credited respondent with believing that her testimony during the adjudication hearing was true, but it also rejected the substance of her testimony as a manipulative attempt to convince it that S.W.'s condition was unavoidable. The court further found that both parents did not exercise the care needed under the circumstances. The court determined that the evidence overwhelmingly established that S.W. was abused because he experienced a lack of support, education, or remedial care, he was in an environment injurious to his welfare, and he was physically abused. Moreover, the court determined that respondent and Sam W. inflicted the abuse or neglect. The court, however,

determined that the State had not proved that C.W. was neglected, and it dismissed the petition for adjudication as to C.W. and returned him to the parents' custody and care.

¶ 9     On October 6, 2022, the trial court entered a dispositional order. The court commented that both Lutheran Social Services of Illinois (Lutheran) and the Department of Children and Family Services (Department) had each separately emphasized that respondent and Sam W. needed to accept the diagnoses of the medical professionals treating S.W., the proposed treatment plans, and acknowledge that S.W.'s medical needs were complex, and they were to cooperate with the medical professionals and agencies involved in S.W.'s case. The court found that both parents had been participating in aspects of the recommended services, but it was concerned that the treatment plan did not appropriately address the parents' underlying problems and determined that additional services were necessary. It ordered a new service plan to be prepared because the original plan did not appropriately address the reasons that led S.W. to be taken into care. The court made S.W. a ward of the court and set a permanency goal of return home in 12 months. The court expressly admonished both parents to cooperate with the Department and to comply with the service plan to correct the conditions that required S.W.'s removal.

¶ 10     In December 2022, an additional service plan and permanency review was created and, on January 13, 2023, filed with the court. The plan acknowledged that the Department and Lutheran evaluated the parents' progress and efforts inconsistently, with the Department finding that the parents were making appropriate efforts and progress in the services, while Lutheran noted that the parents were arguing with S.W.'s diagnoses and refusing to cooperate, thereby making unsatisfactory efforts and progress.

¶ 11     On January 30, 2023, the trial court determined that respondent had made neither reasonable progress nor efforts. Respondent had outstanding uncompleted services, and the conditions of her home remained uncorrected; the court found respondent unfit and unable to care

for S.W., but it did not change the goal of return home, and it determined that the planned services were appropriate to fulfill the return-home goal.

¶ 12    The Department completed a May 2023 permanency review and updated service plan. Respondent had completed parenting classes and continued to attend individual and family therapy. However, she remained either unwilling or incapable of providing S.W. an appropriate amount or variety of nutritious food, even after coaching. In addition, respondent persisted in believing that S.W. had underlying conditions that caused his medical issues, denied that she had not given S.W. sufficient nutrition, did not implement the recommended strategies and interventions she learned in parenting training, and refused to verbalize agreement with S.W.'s diagnoses and recommended course of treatment. The Department opined that respondent had not made reasonable progress in addressing the conditions that led to S.W. entering care.

¶ 13    On September 22, 2023, the trial court held a permanency hearing. It determined that the parents had not cooperated with the Department or done all that was asked of them. For example, they persisted keeping S.W. on their health insurance after requests to remove him which delayed S.W.'s treatment and medication and caused the foster family to have to pay out of pocket to timely provide S.W. necessary medicines and services. Similarly, the parents refused to change therapists after Lutheran terminated its contract with their then-therapist, they refused to implement the strategies and techniques that had been developed and were successful in facilitating S.W.'s eating, and they persisted in denying any accountability or responsibility for the conditions that led to S.W. being taken into care. Moreover, the court specifically found that respondent did not believe she needed to change anything in her approach to parenting and caring for S.W. The court determined that respondent had made neither reasonable efforts nor progress toward reunification, found her unfit and unable to care for S.W., and changed the permanency goal to substitute care. The State was granted leave to file a petition to terminate parental rights.

¶ 14    In a September 2023 permanency review and updated service plan, the Department opined that respondent continued to make neither reasonable efforts nor progress. It noted that she refused to sign needed consents to allow her to be referred to a new, departmentally approved, therapist and posted misleading and false information on her social media about S.W. and his circumstances. Nevertheless, respondent was rated satisfactory in other aspects of her services, such as cooperating with court orders and the Department, participating in individual counseling, and completing specialized parenting courses.

¶ 15    On November 15, 2023, the State filed its petition to terminate respondent's parental rights. At the commencement of the hearing, the State requested that the trial court take judicial notice of certain portions of the court file, namely the adjudication and dispositional orders, the order declaring the original service plan to be inappropriate, the orders resulting from the January and September 2023 permanency hearings, respondent's testimony, and other court orders. No objections to the scope of the proposed judicial notice were lodged, although Sam W.'s counsel objected to the State's characterizations. The court sustained the objection, stating that it would not consider any characterizations, but would only review the documents themselves. During the hearing, various exhibits were admitted, including an integrated assessment, service plans, reports provided by the service providers and Department, permanency hearing reports, and copies of posts from the parents' social media.

¶ 16    Lindsey Burcham testified that, in February 2022, she was assigned by Lutheran to oversee S.W.'s case when he became a specialized medical placement at Almost Home Kids. In March 2023, she became the parents' caseworker when Lutheran took over all responsibility; before that date, the Department assigned a caseworker for the parents. Burcham testified about her responsibilities in preparing the service plans and monitoring the parents' progress. While S.W. was under care, he improved, although he suffered setbacks and infections due to the seriousness

of his condition when he was taken into care. Generally, the parents attended parenting classes and individual therapy, but they did not internalize the lessons and apply the strategies and interventions that Lutheran developed and were successful in getting S.W. to eat more varied and nutritious food, preferring their own, unsuccessful, strategies. Respondent's individual therapists testified that she completed classes and regularly attended therapy sessions and believed she was making progress in dealing with the issues surrounding S.W.

¶ 17    On February 26, 2024, the trial court issued a written determination finding respondent to be unfit on the grounds that she had not made reasonable efforts or progress correcting the conditions that caused S.W. to be taken into care or toward the return of S.W. in specified nine-month periods, and that she had repeatedly or continuously failed, while physically and financially able, to provide S.W. with adequate food, clothing, or shelter. In its analysis, the court first noted that, on July 29, 2022, S.W. was adjudicated to be a neglected or abused minor, and, in the October 6, 2022, dispositional order, the parents were found unfit and unable to care for S.W. Next, the court recounted the result of the January and August permanency hearings, noting that it had determined respondent had made neither reasonable efforts nor progress toward S.W.'s return home. The court then provided the following analysis of the evidence and issues:

> "Throughout this case, which began over three years ago, the parents have never taken responsibility for [S.W.] coming into care. He was failing to thrive, needing a g-tube for nourishment, afraid to stand because his legs would 'crack,' was constipated and not urinating, and had other numerous health condition, he could not read or write, and was extremely ill. He had not seen a physician in 2-3 years. He was 'home-schooled.' His condition was not something that occurred abruptly; it was abuse/neglect over a great period of time. [Respondent] has said she 'thought' about taking him to the doctor sooner. [Respondent's] attorney argued that [respondent] had criminal charges pending so she

could not admit responsibility. That is disingenuous. [Respondent] was found guilty of three Class 4 felonies of Reckless Conduct/Great Bodily Harm ([S.W.] was the victim) on September 28, 2023. It is important to note that this court conducted an *in camera* with [S.W.] and he is a normal, thriving boy, who just turned 10 years old. He has been out of his parent's [*sic*] care for over three years.

The parents have stated that they completed all recommended services and therefore [S.W.] should be returned home. The State argues that there is more to compliance than checking off boxes. Some boxes have been checked but there is no evidence that anything was attained or learned from those boxes. They have not completed, nor have they cooperated with therapy. They attended counseling with Sheri McCue, who this Court has harshly stated is unacceptable; who would not tell [Lutheran] *how* the parents were accepting responsibility for [S.W.] coming into care even though a waiver had been signed and she was under [contract with Lutheran]. The parents refused to change counselors.

The agency accommodated the parents' visitation. The [Lutheran] supervisor even gave up her weekend personal time to supervise the parents. When they started parenting time, [S.W.] regressed. They missed one of the scheduled visits because the family went to Chicago to pickup [Sam W.] from a seminar? [*sic*] That seemed unbelievable. It sounded more like an outing for the whole family. How is that putting [S.W.] first? The parents complained that the foster parents were getting training on how to feed [S.W.] and they were not. [S.W.] was living with the foster parents and it [was] urgent they had the tools to help [S.W.] The parents were getting those tools and not implementing them. Additionally, their training was impeded by them being banned from [S.W.'s] medical housing due to their behaviors.

Even though the parents were given the tools to help [S.W.] eat; [*sic*] tools that had proved successful, they rejected those tools and made their own. They still allowed screen time at meals and brought Doritos to feed [S.W.] They refused to cancel their health insurance [for S.W.], although it was brought up in court and by [Lutheran] several times that their son needed medications he was not getting because of their failure to [remove S.W. from their insurance plan].

The parents sensationalized their son's condition on social media and attempted to fundraise off of his condition.

[S.W.] has not been with his parents for the last third of his life. He is now robust, happy, and as healthy as possible. If he were to return home to a place where [respondent] says he 'ate well before he came into care and he will eat well when he is returned home' (per Burcham's testimony), he will suffer the same condition he was in when he came into care. There is absolutely no indication that the parents take any responsibility for the conditions which brought [S.W.] into care and there is absolutely no indication that they will be able to care for him properly. [S.W.] has come too far in recovery to return to that environment."

¶ 18      The trial court determined that respondent had not made reasonable efforts to correct the conditions that led to S.W.'s removal, or reasonable progress toward the return home of S.W. The court also determined that respondent repeatedly or continuously failed, although physically and financially able, to provide S.W. with adequate food, clothing, or shelter, stating that respondent and Sam W. "basically starved [S.W.], save [for] Cheez-its, prior to his coming into care. So much so that he was afraid to stand, was malnourished and needed a feeding tube. They did not take him for medical treatment until it was almost too late."

¶ 19    Following the trial court's issuance of its written unfitness determination and a brief oral summary, on February 26, 2024, the matter proceeded to the best interest hearing. The State requested that the court take judicial notice of the evidence and testimony from the unfitness portion. Sam W.'s counsel objected, arguing that much of the evidence and testimony would be irrelevant, but the court overruled the objection, reasoning that, while the proceedings had been conducted in two parts, it was still a single hearing with the best interest portion simply a continuation of the hearing on the petition to terminate parental rights.

¶ 20    Burcham testified that, in April 2023, S.W. met the foster family when they began to receive training about his care. In July 2023, he was placed with the foster family, and the foster parents thereafter signed a commitment to adopt S.W. S.W. exhibited a loving bond with his natural parents, but he had also developed a loving bond with his foster family: he seeks comfort from his foster parents and calls them mom and dad, he participates in family activities, and he refers to the foster parents' house as his home. The family fosters two other children, an older female attending college, and a younger, seven-year-old male who shares a room with S.W. Despite minor sibling-type conflicts, S.W. and the younger boy get along and enjoy spending time together. They participate in swimming lessons, baseball, an afterschool program, and other activities together. The foster parents' extended family and a part-time nanny are also now part of S.W.'s life.

¶ 21    The foster parents provide all necessary care for S.W. Before his placement, the foster parents learned about S.W.'s habits and his food preferences and recommended menus from Almost Home Kids, S.W.'s medical placement. They take S.W. to his many medical appointments with his cardiologist, orthopedist, and other treating physicians. They work with a nutritionist and an occupational therapist to help S.W. with chewing techniques and eating his food. Since December 2023, all of S.W.'s food intake has been oral, and his cecostomy tube has been removed,

and he requires no further medically specialized care. When S.W. was still on respondent's insurance, there were times when his medication and medical equipment were delayed, so the foster parents paid out-of-pocket to timely provide the necessary medicine and medical equipment.

¶ 22    During the case, Lutheran facilitated visits between S.W. and his brothers. The foster mother testified that she would be guided by S.W.'s best interests—his desires, safety, and health, in determining to continue S.W.'s sibling visitation.

¶ 23    During his placement with the foster family, S.W. demonstrated social, emotional, and physical growth. He became more adventurous: he was eating and trying more and different food and was participating in family activities. Burcham testified that she had not discussed the termination of parental rights with S.W. and did not know his feelings about it. Burcham opined that respondent's parental rights should be terminating, basing on S.W.'s progress since coming into care and respondent's continued lack of understanding and progress.

¶ 24    C.W., S.W.'s middle brother, testified on respondent's behalf. He was a 16-year-old junior in the local high school and was receiving A grades. C.W. saw S.W. once a month when he attended family visitation. Before, he had inconsistent visitation with S.W. because of his school schedule. C.W. testified that he has a close relationship with S.W., and it was hard not to see each other vey much. C.W. misses S.W. and believes he would be a good role model for him. C.W. also testified that he observed S.W. eat during their supervised visitation, and he commented that respondent made most of the family's meals at home, and they were usually prepared from healthy and good ingredients. C.W. also observed that respondent received plenty of support from her extended family and church friends.

¶ 25    In closing argument, respondent argued that she had been unfairly prevented from receiving training about S.W.'s needs, while the foster parents received that training. Respondent

also noted the bond between S.W. and his brothers and contended that it would not be in his best interests to separate the siblings.

¶ 26    The trial court rejected respondent's complaints about being excluded from training while S.W. was in the care of Almost Home Kids. The court reasoned that the foster parents needed immediate training because S.W. was being placed with them, while respondent would not soon be taking S.W. home. Moreover, the court found that it was due to the parents' own actions that they were precluded from receiving direct training. The court further reasoned:

> "As far as the best interest of [S.W.], and that's who we're talking about here, I did have the opportunity to meet [S.W.] He is a person. He is the subject of this case, but he is a child, and he is entitled to have a good life. He's entitled to be cared for, to be fed, clothed and housed. His foster parents are doing a mighty fine job of that, and is he [*sic*], like I said, he's thriving. I'm really—I really, really feel sorry for [C.W.] My heart went out to him having to testify like that.

> Foster mom said that she will do what is in [S.W.'s] best interest regarding sibling visitation. I believe her. We're not looking at [C.W.'s] best interest in this case. I am not going to send [S.W.] back to a home, which it was kind of intimated by [Sam W.'s and respondent's counsels], because it would be in his best interest to go back to the home to a place where he was starved, not taken care of, didn't get taken to a doctor, just because he wants to see [C.W.] [C.W. is] going away to college in a year. [C.W. and S.W.] have hardly seen each other, and that's, quite honestly, on [C.W.] because [C.W.] said that prior visits were inconsistent due to his [school schedule]. So I—I do feel sorry for [C.W.] I hate to use the term, but I think he was used, and that saddens me.

> The foster parents are willing to adopt [S.W.] They have arranged all of his medical visits. They've arranged extracurricular activities for him. They've welcomed him into

his home. He has a foster brother there that they seem to get along just as brothers do, which means sometimes yes, sometimes no. He is silly, he's funny. I don't know what he was like before, but he's doing well, and I do think it's in his best interest that [respondent's and Sam W.'s] parental rights are terminated."

¶ 27 On February 26, 2024, the trial court entered a written order terminating respondent's parental rights with regard to S.W. Respondent timely appeals.

¶ 28                                II. ANALYSIS

¶ 29 On appeal, respondent argues that the trial court's judgments on respondent's unfitness and the child's best interests were against the manifest weight of the evidence. Regarding unfitness, respondent argues that the court erred in determining that respondent failed to make reasonable efforts to correct the conditions that were the basis for S.W.'s removal (750 ILCS 50/1(D)(m)(i) (West 2022)) and reasonable progress toward reunification (*id.* § 1(D)(m)(ii)) because it took "wholesale judicial notice" of the court file without "pars[ing] exactly" what evidence it considered. Regarding the remaining ground of unfitness, that respondent failed to provide S.W. with adequate food, clothing, or shelter (*id.* § 1(D)(o)), respondent contends the court erred because it was physically impossible to provide these to S.W. as he was in foster care. Regarding the child's best interests, respondent argues that the court improperly imported the unfitness findings into its analysis and failed to account for the Department's preference to train the foster parent instead of her about S.W.'s care or the strong mother-child bond existing with S.W.

¶ 30                    A. Accelerated Appeal Filing Deadline

¶ 31 This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under this rule, we are required to issue our decision within 150 after the filing of the notice of appeal unless good cause has been shown for the delay. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 32    Here, respondent's notice of appeal was filed on March 20, 2024, and our disposition was due to be filed August 19, 2024, which deadline has passed. We note, however, that respondent requested and was granted two extensions totaling 35 days, and the State requested and was granted one extension of 8 days. In addition, the record is voluminous, reflecting the nearly four-year lifespan of this case, and respondent's primary issue on appeal requires a careful and painstaking review of that record to allow us to determine what evidence from all hearings prior to unfitness hearing may have been hearsay or otherwise inadmissible and thus, out of bounds for the trial court's proper consideration in reaching its determination, along with the related issue of whether the court did, in fact, rely on such improper evidence in reaching its determination. Due to the extensions given and the intricacy required for our consideration of this voluminous record, we conclude that good cause exists for issuing our disposition after the 150-day deadline. *Id.*

¶ 33                                    B. Unfitness Findings

¶ 34    Respondent first argues that the trial court's unfitness findings were against the manifest weight of the evidence. A parent's rights cannot be involuntarily terminated unless the court first determines, by clear and convincing evidence, that the parent is unfit, as that term is defined in section 1(D) of the Adoption Act (750 ILCS 5/1(D) (West 2022)). *In re N.G.*, 2018 IL 121939, ¶ 28. Cases concerning parental fitness are *sui generis*, meaning that factual comparisons between cases are of limited value. *Id.* ¶ 29. The court's finding of unfitness will not be disturbed unless it against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.*

¶ 35    The trial court determined that the State had proved three grounds of unfitness alleged: failure to make reasonable efforts to correct the conditions that led to S.W.'s removal, failure to make reasonable progress toward S.W.'s return within any nine-month period (July 29, 2022, to April 30, 2023; October 6, 2022, to July 6, 2023; January 30, 2023, to October 30, 2023; and

February 14, 2023, to November 14, 2023), and repeated failure to provide S.W. with adequate food, clothing, or shelter. We note that any single ground of unfitness, properly proven, is sufficient to support the termination of parental rights. *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 43. Regarding the reasonable efforts-reasonable progress grounds, respondent argues that the trial court improperly took judicial notice of the court file and failed to specifically describe what evidence and sources it used in fashioning its February 26, 2024, written unfitness determination. Respondent contends that the court's judicial notice of the court file "failed to parse exactly how each proposition [from the noticed court file] was considered in the fitness hearing where the rules of evidence strictly apply" so as to avoid relying on inadmissible or hearsay evidence.

¶ 36    The legal standards regarding taking notice of the record in the unfitness proceeding have been well established. See *In re J.G.*, 298 Ill. App. 3d 617 (1998). It is generally inappropriate and unnecessary to take judicial notice of everything that has taken place before the unfitness hearing. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 53. In proceedings to terminate parental rights, there are many different evidentiary hearings with different purposes and different evidentiary standards. At the beginning of the case, a temporary custody or shelter care hearing is held to determine whether probable cause exists to believe that the minor is abused or neglected, and whether it is a matter of immediate and urgent necessity for the minor's safety and protection to place him or her into shelter care. *Id.* ¶ 59. The evidence given will consist of testimony from all before the court on any matter connected with the allegations in the petition, and the Department is required to give testimony concerning all indicated reports of abuse and neglect of which it is aware. *Id.*

¶ 37    Next, at the adjudicatory hearing, the issue is whether the minor is abused, neglected, or dependent, and the hearing is conducted according to the formal rules of evidence applicable to civil proceedings. *Id.* ¶ 61. If the minor is found abused or neglected, the court proceeds to a

dispositional hearing, and "[e]ssentially, there are no rules of evidence governing what the court may receive and consider." *Id.* ¶ 63. The court's decision in the dispositional hearing is based on the best interests of the minor based on the totality of the circumstances surrounding his or her life, and is intended to fully plumb all circumstances, including newly discovered or additional deficiencies in the parental home, and the scope of the hearing is not limited solely to those circumstances alleged in the initial abuse and neglect petition. *Id.* ¶ 64. The orders entered at the dispositional hearing may become relevant during later proceedings, as these orders set the benchmark from which to measure the parents' progress and efforts at correcting the circumstances that caused the intervention or toward return of the child. *Id.* ¶ 65.

¶ 38 Next, the trial court will hold regular permanency hearings to consider the permanency goal, the service plan and the appropriateness of the ordered services, and the parents' efforts, progress, and fulfillment of the service plan and goals. *Id.* ¶ 71. A permanency hearing is effectively a continuation of the dispositional hearing, and there are no rules of evidence that govern what the court may receive and consider. *Id.* ¶ 72.

¶ 39 Finally, if necessary, the case proceeds to a termination proceeding, in which an unfitness hearing is held, followed, as necessary, by a best interest hearing. *Id.* ¶ 74. The unfitness hearing, like the adjudicatory hearing, is governed by the formal rules of evidence applicable to a civil proceeding; the best interest hearing, like the dispositional and permanency hearings, is not constrained by the rules of evidence and the trial court may consider all evidence that may help it to determine the minor's best interests—even evidence that would be inadmissible if the formal rules of evidence were applied. *Id.* ¶¶ 75-76.

¶ 40 The unfitness hearing requires the trial court consider the parents' efforts and progress toward the return of the minor, and to measure that progress, the court must necessarily consider how the case began and the services the parents were required to complete. *Id.* ¶ 79. Thus, the

court will usually and properly take judicial notice of its previous orders, findings of fact, and sworn testimony previously heard. *Id.* However, the evidence underlying the orders and findings, particularly the evidence adduced at the dispositional and permanency hearings, may not be considered by the trial court in the unfitness hearing if it introduces otherwise inadmissible hearsay evidence. *Id.* ¶ 81.

¶ 41 The proper procedure, then, for the trial court to take judicial notice of portions of the court file in an unfitness hearing is for the State to make a proffer to the court of the material requested to be noticed. *Id.* ¶ 85. Respondent's counsel should then be allowed to object to the inadmissible and improper portions of the proffer. *Id.* This procedure focuses the court's consideration on the matters that are admissible under the rules of evidence, and it also makes it easier for a reviewing court to review the record on appeal to determine what the trial court actually relied upon in making its decision. *Id.* It is therefore incumbent upon all participants in the unfitness hearing, the court, the State, respondents' counsels, and the guardian *ad litem*, to ensure that only admissible evidence be judicially noticed, and to ensure that the record clearly and specifically reflects what evidence the court judicially noticed. *Id.* ¶ 88.

¶ 42 Respondent argues that the trial court's method of taking judicial notice was flawed under *M.D.* Specifically, respondent contends that the trial court "did not, with sufficient specificity, delineate exactly from what sources and how it [took judicial notice] in support of the numerous propositions it provided to reach the ultimate conclusion that [respondent] was an unfit parent." Moreover, "while presumably the court used the sources it cited, it failed to parse exactly how each proposition was considered in the fitness hearing where the rules of evidence strictly apply as in any other civil proceeding." Respondent concludes that the court erred because "the wholesale judicial notice taken by the court in the manner it chose to take it was insufficient to meet the requirements of a fitness hearing." Respondent attempts to provide some specifics to her

argument, contending that the "vast majority" of the testimony purportedly judicially noticed was given at permanency hearings and, while it may have been subject to cross-examination, such cross-examination would likely have not been targeted to explore the exact contentions and allegations in the petition to terminate parental rights.

¶ 43   Respondent's argument fails to address the actual procedure employed at the fitness hearing. There the State requested the trial court to take judicial notice of the following items from the court file:

> "the petition for adjudication of wardship, the July 29th, 2022 adjudicatory order, the July 29th, 2022 memorandum and decision, the September 8th, 2022 dispositional order, the September 13th, 2022 dispositional order, the October 6th, 2022 decision and dispositional order, the December 5th, 2022 Court order finding the service plan inappropriate, the January 30th, 2023 permanency order, including the findings of no efforts or progress on behalf of Respondent Parents and that they were unfit and unable, the September 22nd, 2023 memorandum and decision also making a finding of no efforts, no progress for Respondent Parents and finding them unfit and unable, as well as Respondent Mother's testimony from May 16th of 2022, May 23rd of 2022, and August 28th of 202[3]."

¶ 44   Sam W.'s counsel objected to the State's "characterizations of some of those documents." The trial court sustained the objection and assured the parties that it would only look at the documents and would disregard any characterizations.

¶ 45   In its written February 26, 2024, decision, the trial court noted that the State made a proffer as to the documents it wished the court to judicially notice, and it noted that the parents had objected to the State's characterizations of those documents. The court repeated that it was taking judicial notice only of the documents, not the State's characterizations of the documents. The court further noted that no other objections to the request for judicial notice were made.

¶ 46    The trial court also expressly noted that it was considering only "legally permissible evidentiary portions of the exhibits entered into evidence," and overall, it considered only admissible evidence adduced at the unfitness hearing.  The court further commented on the issue of judicial notice:

> "The Court applied the requisite standards and burdens of proof at this stage of the proceeding.  The issue of what was considered by the Court in this matter was prominent.  There was much discussion about Judicial Notice of the file and there were discrepancies between what counsel said at hearing from what they argued in their written closing arguments.  The State asked the Court to take Judicial Notice of the file in this matter; Attorney Haiduk [Sam W.'s counsel)] stated on the record, 'I would join the State's motion to have the Court take judicial notice of the file and highlight specifically the CASA report.' (12-11-23 PM transcript page 18).  Yet, he argued in court and in his closing argument that he needed to know what the Court would be considering hearsay in those documents.  Obviously, that would be overburdensome and not practical in a case that is well over three years old and contains multiple, may [*sic*] voluminous, reports.  If an attorney is not certain if the court will consider a statement contained in the file, due to hearsay, they should [e]licit the testimony at hearing."

¶ 47    The foregoing demonstrates that the trial court followed the procedures described in *M.D.* The State asked for judicial notice of specific portions of the record, respondent and the other parties were given an opportunity to object (and did), and the court resolved the objection.  Moreover, throughout its written judgment, the court repeatedly discussed that it considered admissible, non-hearsay evidence from the various sources.  We have carefully reviewed both the record and the court's written February 26, 2024, unfitness determination, and we conclude that the court was careful not to incorporate any hearsay testimony into its analysis.  The court

expressly considered the dispositional and permanency orders as they related to respondent's efforts and progress with the ordered services and goals of correcting the conditions that led to S.W.'s removal and toward reunification with him but did not stray into any underlying hearsay evidence presented at those hearings. While even greater detail than that already provided may have been helpful, the court complied with the procedures in *M.D.* sufficiently and with sufficient clarity to allow our efficient review of its decision and to allay any concerns that it considered impermissible evidence in rendering its decision. We therefore reject respondent's contention that the court's discussion of what it judicially noticed was inadequate.

¶ 48 To the extent that respondent argues, independent from her judicial notice contention, that the trial court's determination of unfitness was against the manifest weight of the evidence, we disagree. This case was initiated when S.W. was taken into shelter care on the literal verge of starving to death. In July 2022, S.W. was adjudicated abused and neglected. In a January 30, 2023, permanency hearing, the court determined that neither parent had made reasonable efforts or progress in reunification with the minor. Following an August 2023 permanency hearing, on September 22, 2023, the court entered a permanency order changing the goal from return home to substitute care pending court termination of parental rights. In that order, the court also determined that respondent had not made reasonable efforts or progress at reunification with the minor or correcting the conditions which led to his removal.

¶ 49 We reviewed the evidence presented at the unfitness hearing, and this included the reports of the caseworkers entered as exhibits without objection. The caseworkers opined that respondent had not made reasonable efforts or progress to reach the goals set by the ordered services. The evidence shows that respondent never took responsibility or demonstrated any understanding for the role she played in causing S.W. to come into care—indeed, S.W.'s medical condition was not a sudden onset, but it occurred over months and years. The evidence further shows that respondent

may have completed classes, but never has she demonstrated and incorporated the lessons she learned in those classes into her interactions with S.W. For example, the evidence shows that, while at Almost Home Kids, strategies were successfully developed and honed to help S.W. eat a nutritious meal, and these nutritional strategies and feeding techniques were a significant purpose and goal of respondent's visitations. Yet, without fail, during those visits, respondent would not employ these proven strategies, and S.W. would generally eat little to nothing during the visits. Malnourishment is what caused S.W. to be taken into care, and during the life of this case, respondent demonstrated that she understood nothing and learned nothing about providing healthy and sufficient nourishment to S.W. We cannot say that the trial court's determination that respondent failed to make reasonable efforts or progress in correcting the issues that led to S.W.'s removal was against the manifest weight of the evidence. Because we need only determine that the State proved a single ground of unfitness, we need not consider the remaining grounds.

¶ 50 Respondent argues that, because S.W. was in the care of others for such a lengthy time, she cannot be found unfit on the basis that she failed to protect him. This argument refers to the third ground of unfitness, that respondent repeatedly or continuously failed to provide S.W. with adequate food, clothing, or shelter. As we have found that the court's unfitness decision soundly rests upon the first ground of alleged unfitness, we need not consider respondent's contention.

¶ 51 Respondent also argues that the trial court insufficiently considered that neither of S.W.'s older brothers were endangered or adjudicated abused and neglected. Respondent reasons that the "question of a parent's fitness as to one child is relevant to the determination of that parent's fitness as to another child," and cites *In re D.F.*, 201 Ill. 2d 476 (2002) in support of the proposition. Respondent notes that relevant evidence is generally admissible and defined as tending to make the existence of a fact more or less probable than it would be without the evidence. Respondent then implies that the evidence about S.W.'s older brothers is relevant because it makes the issue

of unfitness with respect to S.W. less probable because she was a fit parent to the other brothers. While this reasoning may hold together in the abstract, it is gutted by giving *D.F.* its natural import. In *D.F.*, *id.* at 500-01, our supreme court stated that, until that case, it "never had occasion to consider whether evidence supporting a finding of unfitness as to one of a parent's children may serve as a basis for a finding of unfitness as to another child." In other words, *D.F.* considered whether the evidence of unfitness regarding a child in S.W.'s position could be used as a basis for a finding of unfitness toward a child in the brothers' position—effectively the opposite of the proposition which respondent seeks to invoke. That respondent may have abused and neglected one child while not abusing and neglecting significantly older siblings is a fortuity, not a reason to find that the child nearly starved to death was not actually abused or neglected because the other siblings were not also subjected to starvation.

¶ 52    Moreover, we note that the parent's fitness is not measured simply by what she has done with her children—rather, it is measured over time as she is assigned and completes services selected in furtherance of the goals of correcting the issues that brought the child into care and of reuniting the family. The lack of adjudication with respect to the older siblings does not provide a yardstick to measure whether respondent absorbed and utilized the lessons of required services, her efforts to do so, and her progress in those services. Respondent's argument side-steps these issues and asks this court to reweigh the evidence considered by the trial court and to give the evidence that the older siblings were not abused and neglected paramount importance over all other circumstances, including her efforts and progress in undertaking and completing the assigned services. We reject respondent's contention.

¶ 53    Accordingly, we conclude that the trial court's determination that respondent was unfit for failing to correct the circumstances that brought S.W. into care was not against the manifest weight of the evidence.

¶ 54                                    C. Best Interests

¶ 55     Respondent argues that the trial court's determination that it was in S.W.'s best interests to terminate her parental rights was against the manifest weight of the evidence.  At the best interest hearing, the court focuses on the child and whether the termination of parental rights would improve the child's prospects and his or her future financial, social, and emotional atmosphere.  *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002).  We will disturb the court's determination of the child's best interests only if it is contrary to the manifest weight of the evidence.  *In re Tr. A.*, 2020 IL App (2d) 200225, ¶ 32.

¶ 56     In assessing the child's best interests, the trial court must consider the statutory factors of: the child's physical safety and welfare; the development of the child's identity; the child's background and ties; the child's attachments, including where he or she feels love, attachment, and security; the child's wishes and goals; the child's community ties; the child's need for permanence and stable relationships; the uniqueness of every family and child; the risks attendant to entering and being in substitute care; and the preferences of the persons available to care for the child.  705 ILCS 405/1-3(4.05) (West 2022).  The court must consider all the factors; no single factor is dispositive.  *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 31.  Additionally, the court's determination need not include an express reference to each factor, and we may affirm the court's decision on any ground supported in the record, even those not discussed by the trial court.  *Id.*

¶ 57     Respondent contends that, "by providing a 23-page written decision regarding fitness on the morning of the best interest hearing, the [trial] court had decided significantly prior to the best interest portion of the hearing that [respondent] was an unfit parent."  Respondent then states that respondent's "counsel's questioning regarding what the minor's home situation for the minor's sibling, [C.W.], was clearly relevant to the best interest factor for the minor, namely: the physical safety and welfare of the child, including *food*, shelter, health, and clothing."  Respondent does

not, however, complete these thoughts or potential arguments by claiming some impropriety with or prejudice accruing from the court's prepared-in-advance written decision, and, likewise, respondent does not argue anything with respect to the questioning of C.W. during the best interest hearing or claim any prejudice accruing from it. These statements, then, fail to constitute cognizable argument and we find any claim they touch upon to be forfeited by that failure to actually provide argument on the point. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Further, we strenuously reject any insinuation that it was improper for the court to prepare a written decision in advance, to issue that written decision, and then to move forward in the proceedings. The record fully demonstrates that the parties were prepared for further proceedings and respondent does not identify any issue arising from the trial court's procedure here. Rather, we endorse the court's procedure as proper and efficient.

¶ 58    Next, respondent contends that the "trial court mentioned the parents' unfitness three separate times on the record during the best interest portion of the [termination of parental rights] hearing." Respondent argues that court's analysis was focused on respondent's unfitness rather than S.W.'s best interests—essentially concluding that the court's discussion amounted to little more than "it was not in S.W.'s best interest to return home *because* [respondent] was unfit—as opposed to *in addition to* [respondent] being unfit." (Emphasis in original.) Initially, we note that, despite claiming that the trial court "mentioned" the parents'[2] unfitness, she does not include, as required, citation to the record in support of her contention. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

_____

[2]We note that respondent does not refer to statements the trial court made about her specifically, but instead lumps both parents together for purposes of this contention.

¶ 59    Nevertheless, the State supplied citations to the claimed instances.  In the first instance, the court engaged in a brief discussion with respondent's counsel arising from a relevance objection when he questioned C.W. about the "homeschooling environment" respondent provided him. Counsel suggested that respondent's homeschooling of C.W. "set him up for success," and the court questioned how C.W.'s education related to S.W.'s best interests.  Counsel argued that S.W. would similarly "receive proper schooling" as had C.W., and the court noted that the homeschooling would be administered by "a parent [it] found unfit."  Counsel then acquiesced and stated he would move along in his examination.  We interpret the court's comment to indicate its concern that respondent, who was found unfit for failing to understand and correct the environment that caused the conditions leading to S.W. being taken into care, would keep S.W. in that uncorrected environment under the guise of providing education.  This would also screen him from the view of outsiders required to report should the conditions that caused S.W.'s near death by starvation recur.  Being placed back into the environment that directly threatened S.W.'s health and which respondent was unable and unwilling to correct is directly related to S.W.'s best interests even though the court expressed itself using the shorthand vocabulary of unfitness.

¶ 60    In the next instance, C.W. was answering respondent's counsel's questions about the types of nutrition he received from respondent.  C.W. was discussing that the dinners were cooked by respondent, from good ingredients, and were healthy.  The State objected on the grounds of relevance.  Respondent's counsel suggested that S.W. would be living in the same home environment that C.W. was currently experiencing.  The court noted that it "found [respondent] to be an unfit parent" and sustained the objection.  The mention of unfitness again related to respondent's inability to understand and accept her part in creating the environment and circumstances that led to S.W. being taken into care, and her inability to correct those circumstances.  Specifically, S.W. was consistently malnourished to the point that he was on the

verge of starving to death. Whether C.W. was given adequate nourishment does not speak to whether respondent would provide adequate nourishment for S.W., given the prior history and the lack of progress with the services she was ordered to undertake to correct the conditions that led to S.W. being taken into care. This is again a comment on S.W.'s best interests even though it is using the unfitness finding to make that point.

¶ 61    Finally, during the cross-examination of C.W. by Sam W.'s counsel, the State objected on grounds of relevance to counsel's examination about what food respondent was making available to C.W. Counsel suggested that the relevance was that S.W. would reside in the same home as C.W. and partake of the same food. The trial court disagreed, stating that its concern that, "if [S.W.] were to go home to unfit parents, that is the food he would eat, when it's possible that when [S.W.] was taken into care, [C.W.] was eating healthy foods but [S.W.] was not." Despite labeling the parents as unfit, the court once again expressed its concern that the environment had not been changed, because respondent (and Sam W.) had been found unfit precisely for malnourishing S.W. while appropriately nourishing the other siblings, and S.W. would be once again placed into that environment when the parents had not made efforts or progress to correct it.

¶ 62    In each instance of which respondent complained, the trial court used "unfit parent" to refer to the particular concern it had, that S.W. would be returned into the same, uncorrected, dangerous environment from which he had originally been taken. We believe the comments do not represent a "bootstrapping" effort to conflate parental unfitness with S.W.'s best interests, but simply a means to identify its concern as the evidence was being presented that, because the parental unfitness was, in relevant part here, caused by respondent's inability to correct the conditions that led to S.W. being taken into care, returning him to the same, unchanged and uncorrected, environment could not be in S.W.'s best interests. We reject respondent's contention.

¶ 63    Respondent also argues that respondent and S.W. share a substantial mother-child bond, rebutting the foster mother's testimony that S.W. had only asked about respondent a few times. While attachment is among the factors to be considered in assessing a child's best interests, it is one of many, and no single factor is dispositive. 705 ILCS 405/1-3(4.05) (West 2022); *Ca. B.*, 2019 IL App (1st) 181024, ¶ 31. Respondent is essentially asking us to elevate the maternal bond and attachment into a singular and paramount consideration, and to jettison the trial court's judgment altogether. We reject this contention.

¶ 64    Respondent argues that the service providers essentially sabotaged her efforts at progressing by providing the foster mother with training about caring and feeding S.W. while refusing to give her the same training. This misstates the circumstances. Because S.W. was going to be placed with the foster family on an interim basis while the goal remained return home, the foster parents urgently needed the training to care for S.W. Moreover, the conditions—the feeding tube and the cecostomy tube—that necessitated the training, were subsequently resolved. Thus, the training was issue-specific, and respondent's complaint is based on a faulty view of the circumstances.

¶ 65    In addition, respondent and Sam W. were banned from the premises of Almost Home Kids, the agency who was caring for S.W. before placement with the foster family, because of their conduct of misrepresenting the agency's efforts, S.W.'s condition, and publishing this incorrect information on their social media accounts. In other words, respondent's own conduct led to her inability to be directly trained by Almost Home Kids. Thus, respondent, not the agency, sabotaged respondent's training.

¶ 66    Further, respondent was offered the opportunity to receive training that would be relevant once S.W. was returned home. The in-person visits focused on respondent learning and utilizing proven methods and strategies of expanding S.W.'s menu and feeding him nutritious meals.

Respondent continually refused to employ these techniques in favor of her own methods. The techniques employed by respondent yielded the results that led to S.W. being taken into shelter care—S.W. would not eat the meal. This refusal to learn, accept, and employ the offered training is far more troubling than respondent not learning care procedures that, by the time S.W. would have been returned home, would no longer be necessary.

¶ 67 Finally, this argument focuses more on respondent and her ability to satisfy the fitness goals rather than S.W. and his best interests. Indeed, respondent's argument is a microcosm of her claim against the trial court best interest judgment. Respondent's claim that she was prevented from meeting her goals through training speaks to her progress in receiving and completing services, and her argument that this should not be held against her is the type of argument that should have been raised in the challenge to the unfitness determination, rather than the consideration of S.W.'s best interests. We reject it.

¶ 68 As a final matter, we note that respondent's argument does not discuss the trial court's oral pronouncement, or how it may have misapprehended the evidence or even how its best interest determination was against the manifest weight of the evidence. Instead, as discussed above, it obliquely attacks narrow aspects of the proceedings without engaging in any sort of assessment of S.W.'s best interests or even how a change in the narrow aspect challenged would affect those interests. In short, respondent's argument nibbles only at the margins of the court's determination, fails to fully grapple with the issue of S.W.'s best interests, and is wholly unpersuasive.

¶ 69 Accordingly, we conclude that the trial court's determination that it was in S.W.'s best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 70                                III. CONCLUSION

¶ 71 For the foregoing reasons, we affirm the judgment of the circuit court of McHenry County.

¶ 72    Affirmed.